(Nos. 38816, 38817, cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* GILBERT KIMMEL *et al.,* Appellants.

*Opinion filed June 16, 1966.*

Howard T. Savage, of Chicago, for appellants.

William G. Clark, Attorney General, of Springfield, and Daniel P. Ward, State's Attorney, of Chicago, (Fred G. Leach and William A. Bomp, Assistant Attorneys General, and Elmer C. Kissane and Kenneth L. Gillis, Assistant State's Attorneys, of counsel,) for the People.

Mr. Justice Schaefer delivered the opinion of the court:

On the motion of the attorney for the defendants these two cases were consolidated in this court. Both involve prosecutions for violations of the obscenity statute, but the dominant issues in the two cases are dissimilar, and they will be discussed separately in this opinion.

In No. 38817 a jury found the defendant Charles Kimmel guilty on four counts of an indictment which charged him with possession of obscene books with intent to disseminate them. (Ill. Rev. Stat. 1963, chap. 38, par. 11—20(a).) He was fined $1000 on each count. On this appeal he challenges the constitutionality of the statute, and he also contends that the books upon which the prosecution was based were illegally seized from his bookstore, in violation of his rights under the State and Federal constitutions. Because we sustain the latter contention, it will not be necessary to consider other issues raised by the defendant.

On January 25, 1963, the Reverend Francis Lawlor

filed a complaint for a search warrant in the criminal court of Cook County. The complainant alleged that he had purchased four obscene books from the defendant's store at 72 West Van Buren Street in Chicago. The four books were named, and they were attached to the complaint as exhibits. A judge of the criminal court found in an *ex parte* proceeding that the books were obscene, and issued a warrant commanding the seizure of "all copies" of the books that might be found in the defendant's bookstore.

At least four policemen, accompanied by two assistant State's attorneys, executed the warrant. They entered the store at 5:10 P.M. on January 25, ordered the customers to leave, and for the next hour and 20 minutes went through the defendant's stock. One of the assistant State's attorneys testified that he read "some of" the books that were seized: "[O]f the books that were books to read, that is, with printing in them, I leafed through them. The books that were picture books, I looked through them, carefully." By the time the officers left the store, they had seized, according to an inventory prepared by an assistant State's attorney, nearly 1500 books and mazagines. Over 130 separate titles had been taken.

Only one of the counts upon which the defendant was convicted charged the possession of a book named in the search warrant. The other counts charged the possession of various books and magazines that the policemen and assistant State's attorneys had seized on their own initiative.

*Marcus* v. *Search Warrant*, 367 U.S. 717, 6 L. Ed. 2d 1127, involved a search for obscene material under a warrant that left the determination of books to be seized to the officers executing the warrant. The Supreme Court held that the officers' *ad hoc* decisions, made with little opportunity for reflection and deliberation, could not supply a constitutional basis for seizure. The court relied upon the requirement of the fourth amendment that warrants must particularly describe the place to be searched, and the person

or things to be seized. And it noted that the difficulty of determining the line between speech that is protected and speech that may be regulated, suppressed or punished, places obscene literature in a different category from other forms of contraband. "The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression. For the serious hazard of suppression of innocent expression inhered in the discretion confided in the officers authorized to exercise the power." 367 U.S. at 729.

The court most recently evaluated a general search for literature in *Stanford* v. *Texas,* 379 U.S. 476, 13 L. Ed. 2d 431. Mr. Justice Stewart's opinion for a unanimous court reviewed the history of general warrants. "Vivid in the memory of the newly independent Americans," the opinion stated, "were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. * * * They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.' " (379 U.S. at 481.) The court observed that the roots of the fourth amendment went deeper than the colonists' opposition to writs of assistance. General warrants had been used "as instruments of oppression from the time of the Tudors, through the Star Chamber, the Long Parliament, the Restoration, and beyond."

"What is significant to note," the opinion continued, "is that this history is largely a history of conflict between the Crown and the press. It was in enforcing the laws licensing the publication of literature and, later, in prosecutions for seditious libel that general warrants were systematically used in the sixteenth, seventeenth, and eighteenth centuries. * * * It was in the context of the latter kinds of general

warrants that the battle for individual liberty and privacy was finally won—in the landmark cases of *Wilkes* v. *Wood,* [19 How. St. Tr. 1153 (1763)] and *Entick* v. *Carrington* [19 How. St. Tr. 1029 (1765)]." 379 U.S. at 482-83.

The principle derived from this history is that "the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books * * *." (379 U.S. at 485.) The court applied this principle to invalidate a search under a warrant for books and records of the Communist Party which were not specifically identified. Although the State maintains that the *Marcus* case is distinguishable from the one before us because the police officers who executed the warrant in *Marcus* were not supervised by members of the prosecutor's staff, the search in *Stanford* was directed by two assistant Attorneys General of the State of Texas.

In the case before us the officers who searched the defendant's store did not have a general warrant, but they treated the warrant that they had as a license for a general search, and they took advantage of their presence in the bookstore to ferret out and seize whatever they considered to be contraband. An officer need not ignore plain contraband uncovered in a lawful search, (*cf. People* v. *Van Scoyk,* 20 Ill.2d 232,) but it does not follow that the procedure employed in this case can be sustained. The officers were not simply stumbling upon contraband when they brought book after book to the assistant State's Attorney for his examination. Difficult problems of evaluation were involved, and the police were obviously looking not only for what the warrant described but for all that they evenually seized.

Moreover, the Supreme Court has pointed out that because of the first amendment protection afforded to publications, the standards applicable to other types of contraband can not govern the search and seizure of allegedly obscene

materials. "It is no answer to say that obscene books are contraband, and that consequently the standards governing searches and seizures of allegedly obscene books should not differ from those applied with respect to narcotics, gambling paraphernalia and other contraband. We rejected that proposition in *Marcus*." (*A Quantity of Copies of Books* v. *Kansas,* 378 U.S. 205, 211-12, 12 L. Ed. 2d 809, 813.) The *Marcus* and *Stanford* cases require the reversal of the three convictions for the possession of books not named in the search warrant.

A somewhat different problem is posed by the defendant's conviction upon the count of the indictment that charged him with possession of a book named in the search warrant. Here the case most directly in point is *A Quantity of Copies of Books* v. *Kansas,* 378 U.S. 205, which involved a search under a warrant that authorized the seizure of any and all copies of 59 books that a distributor had in stock. The books had been published by one company as part of a single series, and a judge had examined seven of the books before issuing the warrant. The Supreme Court held the seizure invalid even as to the books that the judge had examined. Two of the justices declared that the books should not have been seized, because all literature, including obscene material, is constitutionally protected. Mr. Justice Brennan's opinion for four other justices noted that a seizure of literature may be as repressive as an injunction against further sales, and said: "It is our view that since the warrant here authorized the sheriff to seize all copies of the specified titles, and since [the distributor] was not afforded a hearing on the question of obscenity * * * before the warrant issued, the procedure was * * * constitutionally deficient." 378 U.S. at 210.

In the *Quantity of Books* case and in the case before us, search warrants were used to suppress great numbers of books before their owners had an opportunity to litigate the question of obscenity. The warrant in this case was specific

in authorizing the police "to seize all copies" of the four books it named, and it was thus aimed at suppression rather than at obtaining evidence. Such a sweeping restriction without a hearing can not, in our opinion, be squared with first amendment freedoms. It follows that the defendant's motion to suppress should have been granted, and his conviction must be reversed.

In No. 38816 the defendant, Gilbert Kimmel, was convicted at a bench trial of selling a book in violation of the obscenity statute. (Ill. Rev. Stat. 1963, chap. 38, par. 11—20(a).) On this direct appeal he argues that the statute is unconstitutional in numerous respects, that the book in question is not obscene, and that the State failed to prove that the defendant knew the nature or contents of the book.

At the trial, the Reverend Francis Lawlor testified that he entered the defendant's bookstore at 119 West Van Buren Street in Chicago, went to a rack and selected three books, which he took to a counter and handed to the defendant. The defendant placed the books in a bag, and Father Lawlor paid for them. The book named in the indictment was one of the three books that Father Lawlor purchased.

This testimony was the only evidence that tended in any way to show that the defendant understood the character of the book whose sale was charged. The requirement that a seller know the "nature or content" of a book before he can be punished for its sale is both statutory, (Ill. Rev. Stat. 1963, chap. 38, par. 11—20(a)) and constitutional. (*Smith v. California,* 361 U.S. 147, 4 L. Ed. 2d 205.) The State does not contend that the book's cover was itself obscene, and in our opinion it was not. The evidence was wholly insufficient to sustain the defendant's conviction, and the judgment of the circuit court of Cook County must be reversed.

*Judgments reversed.*