(No. 71350.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. EAGLE BOOKS, INC., d/b/a Book Mart II, Appellee.

*Opinion filed October 15, 1992.*

Neil F. Hartigan and Roland W. Burris, Attorneys General, of Springfield, and Paul A. Logli, State's Attorney, of Rockford (Kenneth R. Boyle, William L. Browers and Marshall M. Stevens, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

Glenn A. Stanko, of Reno, O'Byrne & Kepley, P.C., of Champaign (Daniel J. Cain, of Sreenan & Cain, P.C., of Rockford, of counsel), for appellee.

JUSTICE CLARK delivered the opinion of the court:

On May 27, 1987, defendant, Eagle Books, Inc., d/b/a Book Mart II, was charged by criminal complaint with 144 counts of obscenity, a Class A misdemeanor. Each count alleged that defendant, "with knowledge of the nature or content [of the materials] or recklessly failing to exercise reasonable inspection which would have dis-

closed the nature of the content thereof, provided, offered for sale or otherwise made available an obscene magazine" on May 7, 1987.

On October 16, 1987, defendant filed a pretrial motion to dismiss, asserting that the Illinois obscenity statute (Ill. Rev. Stat. 1987, ch. 38, par. 11—20 *et seq.*) violated its rights guaranteed by both the Federal and State Constitutions. Defendant alleged, *inter alia*, that section 11—20(f)(2) of the obscenity statute (Ill. Rev. Stat. 1987, ch. 38, par. 11—20(f)(2)), relating to affirmative defenses, was vague. Defendant also filed a motion to quash the search warrant, suppress items seized, and order return of "all items received."

A hearing was held on defendant's motion to quash on March 17, 1989. Seven police officers were called by defendant during the hearing on the motion, which related to a search and seizure operation at an adult bookstore located at 623 Seventh Street, Rockford, Illinois. During that testimony, it was revealed that the bookstore, its patrons, and the immediate vicinity had been under video surveillance by the Rockford police department for approximately two weeks prior to May 7, 1987. Pornography and prostitution were advanced as reasons for the surveillance.

Detective Dale Murphy testified that on May 6, 1987, he was directed by the Rockford chief of police to go to the bookstore to purchase a couple of magazines. He had been instructed to look for magazines containing material with "penetration clearly visible," which was the standard given to him by his boss, Lieutenant Rich Galvanoni, to be used in his selection process. Murphy was in the store approximately 15 to 20 minutes and selected two magazines. He could not recall whether he looked through other magazines and, if so, how many. He took the magazines to the counter, paid for them,

and then transported them to the public safety building, where they were held until trial.

William Doner, a Rockford police department investigator, testified that he went to the bookstore on May 6, 1987, with instructions to check for any obscene material. After flipping through approximately 20 to 30 magazines, he purchased two magazines during his 30- to 35-minute stay inside the store. Doner then returned to the police station and put the magazines into evidence.

John Novay, a detective with the Winnebago County sheriff's department, testified that he went to the bookstore on May 6, 1987, with instructions to find material with "penetration clearly visible." He looked through five to six magazines during the 15 to 30 minutes he was inside the store and selected two which he purchased. The magazines were then taken to the office and placed into evidence.

Murphy, Doner and Novay each testified that they executed the affidavits which were attached to the complaint for a search warrant. Evidence at the hearing revealed that the affidavits were prepared by the State's Attorney's office. Novay testified that the magazines purchased by him were presented to the judge and Murphy did not recall whether his were also.

A judge of the circuit court issued a warrant on May 7, 1987, for the premises at 623 7th Street, Rockford, Illinois. The warrant authorized the police to seize "magazines containing depictions or portions of the following acts: cunnilingus, fellatio, anal intercourse, excretion of semen from the penis onto the body of another person, masturbation, vaginal or anal insertion of prosethetic devices, or the insertion of the tongue into the anus, and vaginal intercourse, and records pertaining to the sale or possession of the same." Pursuant to the warrant, officers of the Rockford police department entered the premises in the afternoon of May 7, 1987, and conducted

a search and seizure. The search lasted between two and in excess of three hours. The clerk on the premises was arrested.

The testimony of the police officers established the mechanics of the search. The bookstore premises were closed and locked, including the video arcade which was in an area of the bookstore separate from the magazines. There were no magazines in the video area. Customers on the premises when the search commenced were ejected. An officer was posted outside and potential patrons were denied entry without inquiry as to which part of the bookstore they wished to enter.

Identification officers were called to the scene. They photographed and video taped the entire premises in detail. The video arcade and some tissues and a condom found in the video arcade were the target of many of the photographs, as well as a 25-minute video tape. The tissues and the condom were seized as evidence.

The officers described their participation in selecting magazines for seizure. Doner's instructions were to seize any magazine with any kind of sexual conduct in it. A magazine would be taken if the sexual conduct were only on the front cover or on one page. No attempt was made to evaluate text. According to Doner, the magazine racks, which were full when the officers entered, appeared empty when they left.

Detective Steven Olson testified that he was the primary decisionmaker in the selection process. Looking for materials with "penetration clearly visible," he thumbed through a magazine before making the decision to take it, spending approximately 15 seconds on each magazine. He did not evaluate any story or theme. Olson claimed that no duplicates were taken, but the search warrant return indicated otherwise. One hundred fifty-five magazines were seized. In terms of titles listed, there were nine duplicates and one triplicate.

While executing the search warrant, a delivery man arrived with four or five boxes on a two-wheel cart. He was allowed into the store and detained. One or two boxes on the cart were opened, while the others remained sealed. Using magazines removed from the opened boxes, a second complaint for search warrant, together with supporting affidavit, was filed. A second search warrant, this one for the delivery vehicle, was issued by a judge at 6:05 p.m. and executed that same evening. The search of the van was neither the subject of defendant's motion to quash, nor is it the subject of this appeal.

The magazines which were seized from the shelves in the bookstore as well as the boxes which had been delivered to the store were taken to the public safety building. The warrant return for the boxes removed from the store, which also listed the contents of the boxes taken from the van, showed multiple copies of a majority of the titles. The warrant return for the magazines removed from the store's shelves also revealed multiple titles.

At the conclusion of the evidence and arguments in the motion to suppress hearing, the court took both motions under advisement and issued a written ruling on March 24, 1989. With regard to the motion to dismiss, the court found that the "special justification" clause of the Illinois obscenity statute was vague and indefinite. However, the court held that section 11—20(f)(2) was severable from the remainder of the statute and refused to invalidate the entire statute. The balance of defendant's motion to dismiss was denied.

The court also denied the defendant's motion to quash. Although the record showed that more than one copy of certain titles had been removed from the bookstore, the court concluded that the duplicate copies were inadvertently taken. Accordingly, the court viewed the

search as one conducted for evidentiary purposes, rather than one for pretrial adversarial censorship.

Trial commenced on June 6, 1989. The State's case was similar to the evidence presented in the suppression hearing. Over objection, the same three officers testified about an earlier visit to the bookstore. The seizure process was described in detail. Finally, 144 of the magazines seized at the time of the execution of the search warrant were admitted into evidence over the defendant's objection, as were the purchased magazines, browsing receipts, and a box containing a combination of magazines from the delivery vehicle and from the boxes which had been delivered to the bookstore premises.

Defendant's oral motion for a directed verdict at the close of the State's case in chief was granted in part. A directed verdict was granted on counts 23, 48, 56, and 68, leaving 140 counts.

Defendant called two witnesses, Dr. Joseph E. Scott and John C. Breen. Dr. Scott, a professor in the department of sociology at Ohio State University, testified as an expert witness with respect to a random digit dial telephone poll he had conducted in the State of Illinois regarding attitudes of adults about sexually explicit materials. Scott also testified about his follow-up work to the telephone survey called "ethnography," which included visiting a number of neighborhood video stores throughout the State.

John Breen, a legal investigator, testified that he went to various adult bookstores in different communities throughout Illinois, where he purchased magazines portraying sexual conduct which he observed in the materials in those locations. Breen testified that the materials he had viewed throughout the State appeared to depict the same types of sexual conduct which were contained in the magazines on trial.

Defendant's oral motion for a directed verdict at the close of all the evidence was denied. The jury returned a split verdict, finding defendant guilty of 97 counts and acquitting defendant on 43 counts. The court entered a judgment of conviction upon each of the 97 guilty counts.

Defendant filed a timely post-trial motion which included a motion for judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial, a motion in arrest of judgment and a motion to vacate the judgment. All motions alleged, *inter alia*, that judgment had been improperly entered on each of the 97 counts because the counts all arose out of the same act.

After argument, on August 11, 1989, the motion for judgment of acquittal and the motion in arrest of judgment were denied. The motion to vacate the judgment was taken under advisement.

After briefs were submitted on the conviction and sentencing issues, on October 6, 1989, the court entered a judgment of conviction on each count upon which the jury had found defendant guilty. The defendant was sentenced to a fine of $1,000 on each of the 97 counts, with the fines to run consecutively. The court granted the defendant's request for a stay of execution of the sentence pending appeal.

The defendant filed a timely notice of appeal on October 6, 1989. In a Rule 23 order entered on December 4, 1990, the appellate court reversed the judgment entered against defendant and remanded the cause for a new trial. (204 Ill. App. 3d 1107 (unpublished order under Supreme Court Rule 23).) Relying on this court's opinion in *People v. Capitol News, Inc.* (1990), 137 Ill. 2d 162, 174-75, the appellate court found the complaint filed against defendant to be duplicitous and, therefore, void. The court also ruled that the magazines seized from the delivery man were improperly admitted into evidence. In

addition, it held that only one judgment of conviction could be entered and only one sentence imposed. The appellate court rejected defendant's arguments raised with regard to the warrant and the search conducted thereto. This court granted the State's petition for leave to appeal (134 Ill. 2d R. 315).

The first issue on appeal is whether the complaint is duplicitous. As we noted above, the appellate court answered this question in the affirmative, relying exclusively on this court's opinion in *People v. Capitol News*. The defendant in *Capitol News* was also charged with violating the provisions of the Illinois obscenity statute, which provides in part that it is a crime if a person intentionally or recklessly "[s]ells, delivers or provides, or offers or agrees to sell, deliver or provide any obscene writing" (Ill. Rev. Stat. 1987, ch. 38, pars. 11—20(a)(1), (a)(3); *Capitol News*, 137 Ill. 2d at 174). This court observed that, pursuant to the language of the statute, "[a]cts of sale and of delivery are alternate and disparate acts. *** The proof of one may not be proof of the other." (*Capitol News*, 137 Ill. 2d at 175.) Accordingly, the indictment charging the defendant with having "sold *or* delivered *** an obscene magazine" was void as duplicitous. (Emphasis added.) *Capitol News*, 137 Ill. 2d at 174.

This court also considered questions involved in charging a defendant in the disjunctive in *People v. Heard* (1970), 47 Ill. 2d 501. In *Heard*, the defendant was charged with violating the provisions of the Illinois gambling statute. There, this court stated the following:

> "The complaint, following the language of the [offense of gambling] statute, charged the defendants in the disjunctive, that is, it charged that the defendants set up a policy game *or* promoted a policy game *or* sold tickets and so on. While a charge which follows the language of the statute defining the crime and uses the disjunctive 'or'

will be sufficient under some circumstances, it will not be sufficient where the statute names disparate and alternative acts, any one of which will constitute the offense. [Citations.] The statute here named specific acts which constitute the crime of gambling, some of which acts are clearly disparate and alternative. The promoting of a policy game is not the same act as transferring a policy ticket, for example. The use of the disjunctive under these circumstances causes uncertainty and conjecture as to which of the alternatives the accused is charged with committing." (Emphasis added.) *People v. Heard*, 47 Ill. 2d at 504.

See also *Capitol News*, 137 Ill. 2d at 174.

The result was that the complaint was void because it did not set forth the nature and elements of the charge with certainty required by the State and Federal Constitutions and the Code of Criminal Procedure of 1963. *Heard*, 47 Ill. 2d at 504-05.

In the present matter, the State argues that the use of the disjunctive "or" will render an indictment defective only if it deprives the defendant of notice of the specific nature of the charge made against him, or impairs the certainty that is requisite if double jeopardy is to be avoided. The State argues that the terms in the phrase "provided, offered for sale, or otherwise made available" are so intimately related as to provide defendant with specific notice of the charge against it.

We reject the State's arguments, as we do not believe the terms in the charging phrase are synonymous. For example, a magazine could be "provided" or "made available" without being "offered for sale." The three terms encompass three disparate acts; a magazine may be "made available" simply by making it accessible without involving the consideration necessary for a "sale" or the actual physical transfer involved in "provid[ing]" a magazine. We affirm the judgment of the appellate court finding each count of the complaint to be duplicitous

and, therefore, find that the charging instrument was void.

The appellate court ordered a remand of the cause "for further proceedings consistent with this decision." As cross-relief, defendant seeks to have the remand order vacated.

"If in an appeal it is determined that the charge was fatally defective, the judgment must be reversed." (*People v. Mack* (1974), 24 Ill. App. 3d 455, 460, citing *People v. Fore* (1943), 384 Ill. 455; see also *Heard*, 47 Ill. 2d 501; *People v. Minto* (1925), 318 Ill. 293.) In this matter, the complaint lacked the "necessary certainty to charge an offense"; therefore, it is void. (*Heard*, 47 Ill. 2d at 505.) Amendment of the complaint is improper because "the defect is fundamental and the complaint void" (*Heard*, 47 Ill. 2d at 505); there is nothing for this court to remand in order that the State may amend. Therefore, we grant defendant the cross-relief it seeks and reverse the appellate court order remanding this cause to the trial court.

Although we find that the matter in this case is not triable, the State is not precluded from filing a new complaint against defendant. In anticipation of this possibility, we shall examine the evidence to see if it was sufficient for a conviction in case defendant is retried. We do so in order to avoid double jeopardy problems which would result by subjecting defendant to a second trial after the State failed to produce sufficient evidence in the first trial. (*People v. Taylor* (1979), 76 Ill. 2d 289, 309.) The appellate court examined the evidence and found it sufficient. On appeal, defendant seeks cross-relief on this issue.

In the trial, defendant argued that the search and seizure violated its rights guaranteed by the first, fourth and fourteenth amendments of the United States Constitution and article I, sections 4 and 6, of the Illinois Con-

stitution. Defendant raised issues relating to the warrant application procedure, the adequacy of the warrant and the execution of the warrant. Defendant maintained specifically that the warrant process did not involve any searching focus on the issue of obscenity (*Marcus v. Search Warrant of Property* (1961), 367 U.S. 717, 732, 6 L. Ed. 2d 1127, 1136, 81 S. Ct. 1708, 1716), the warrant was general on its face, and the search was a general one which resulted in the imposition of a prior restraint on communicative materials presumptively protected by the first amendment. The trial court rejected defendant's arguments, as did the appellate court.

We disagree with that part of the appellate court order upholding the search and find that it was constitutionally improper because it was a general search which acted as a prior restraint on the dissemination of materials arguably within first amendment protection. For this reason, we conclude that the evidence used to convict defendant was improperly obtained and should have been suppressed from trial. Therefore, we do not reach, and intimate no view upon, defendant's contention on the other issues raised relating to the warrant.

Defendant argues to this court, as it did below, that multiple copies of the same title were seized. In addition, defendant points out that several boxes of magazines with multiple copies of numerous title were seized after they were brought onto the premises by a delivery man. Defendant argues that the police used the warrant to execute a general search and to search "not only for what the warrant described but for all they eventually seized" and that all the items seized should be suppressed. (*People v. Kimmel* (1966), 34 Ill. 2d 578, 582.) We agree.

In a written order on defendant's motion to suppress, the trial court specifically found that "initially more than one copy was seized by the seizure of the boxes of magazines in the store, *in violation of the Heller standard.*"

(Emphasis added.) However, because the court concluded that there was "a voluntary return of these boxes to the defendant owner," the trial court found that the "seizure of the boxes of magazines was for evidence purposes and not intended as a method for pre-trial adversarial censorship."

The appellate court concluded that although multiple copies of the same title were seized, the multiple seizures were "inadvertent." The opinion referred only to the 155 magazines seized from the bookstore without considering the quantity of magazines contained in the boxes delivered during the search and seized at that time.

The "*Heller* standard" referred to in the trial court's ruling on defendant's motion is contained in the Supreme Court opinion in *Heller v. New York* (1973), 413 U.S. 483, 492, 37 L. Ed. 2d 745, 754, 93 S. Ct. 2789, 2794. In that case, three reels of tape, composing a single copy of a film, were seized on the grounds that the film was obscene in violation of the New York Penal Law. The judge issuing the warrant for the seizure attended a showing of the film at the request of the assistant District Attorney and, after the viewing, signed warrants for the arrest of the manager and for seizure of the film.

The issue before the Supreme Court was whether the warrant issued was constitutionally valid where the film was seized as evidence without a preliminary adversarial hearing on the issue of probable obscenity. Prior to the *Heller* opinion, the Supreme Court had never held that there is an absolute first amendment or fourteenth amendment right to an adversary hearing on the issue of obscenity prior to the seizure of allegedly obscene material. Where a judicial determination of probable cause is made by a "neutral detached magistrate" prior to issuing the warrant, and the magistrate has the opportunity

to "focus searchingly on the question of obscenity," a seizure will be presumed to be constitutionally proper. Consistent with this history of reasoning, the Court held in *Heller* that, in the case before it, an adversary hearing was not required prior to seizure of the film, and that the judicial determination made prior to the seizure of the film was constitutionally sufficient. *Heller*, 413 U.S. at 487-88, 37 L. Ed. 2d at 751, 93 S. Ct. at 2792.

The Court emphasized in its opinion in *Heller* that although the film had been seized, it had not been subjected to any form of " 'final restraint,' in the sense of being enjoined from exhibition or threatened with destruction. A copy of the film was temporarily detained in order to *preserve it as evidence*." (Emphasis in original.) (*Heller*, 413 U.S. at 490, 37 L. Ed. 2d at 753, 93 S. Ct. at 2793.) "[S]eizing films to destroy them or to block their distribution or exhibition is a very different matter from seizing a single copy of a film for the *bona fide* purpose of preserving it as evidence \*\*\*." *Heller*, 413 U.S. at 492, 37 L. Ed. 2d at 754, 93 S. Ct. at 2794.

Although the defendant in *Heller* never so requested, the Court advised that, on a showing to the trial court that the copy of the film seized was the only copy available to the distributor, "the court should permit the seized film to be copied so that showing can be continued pending a judicial determination of the obscenity issue in an adversary proceeding." (*Heller*, 413 U.S. at 492-93, 37 L. Ed. 2d at 754, 93 S. Ct. at 2795.) Until there is a "judicial determination of the obscenity issue in an adversary proceeding," exhibition of a film could not be restrained by seizing all available copies of it. *Heller*, 413 U.S. at 492-93, 37 L. Ed. 2d at 754, 93 S. Ct. at 2795.

The safeguards created in *Heller* echo the concerns voiced by the Supreme Court in a line of cases dating back 30 years. The Court has repeatedly held that "rigorous procedural safeguards must be employed before

expressive materials can be seized as 'obscene.' " (*Fort Wayne Books, Inc. v. Indiana* (1989), 489 U.S. 46, 62, 103 L. Ed. 2d 34, 51, 109 S. Ct. 916, 927.) Large scale confiscations of books and films have been invalidated by the Court where the seizure occurred prior to an adversarial hearing on the obscenity of the materials. (*A Quantity of Copies of Books v. Kansas* (1964), 378 U.S. 205, 12 L. Ed. 2d 809, 84 S. Ct. 1723; *Marcus v. Search Warrant of Property* (1961), 367 U.S. 717, 732, 6 L. Ed. 2d 1127, 1136, 81 S. Ct. 1708, 1716.) In *Marcus* and *A Quantity of Books*, and in those cases coming after them, the Court established that pretrial seizures of expressive materials could only be undertaken pursuant to a "procedure 'designed to focus searchingly on the question of obscenity.' " *A Quantity of Books*, 378 U.S. at 210, 12 L. Ed. 2d at 813, 84 S. Ct. at 1726, quoting *Marcus*, 367 U.S. at 732, 6 L. Ed. 2d at 1136, 81 S. Ct. at 1716. See also *Lee Art Theatre, Inc. v. Virginia* (1968), 392 U.S. 636, 20 L. Ed. 2d 1313, 88 S. Ct. 2103.

The Supreme Court has refined this approach further in its subsequent opinions, including *Heller*. In *Fort Wayne Books, Inc. v. Indiana,* the Court observed that while all copies of a film cannot be seized and thus make it impossible for the film to be exhibited pending a determination of the film's obscenity, "the same is obviously true for books or any other expressive materials."

> "While *a single copy of a book* or film may be seized and retained for evidentiary purposes based on a finding of probable cause, the publication may not be taken out of circulation completely until there has been a determination of obscenity after an adversary hearing. [Citation.]
>
> Thus, while the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause (and even without a warrant in various circumstances), it is otherwise when materials presumptively protected by the First Amendment are involved. [Citation.] It is '[t]he

risk of prior restraint, which is the underlying basis for the special Fourth Amendment protections accorded searches for and seizure of First Amendment materials' that motivates this rule. [Citation.]'' (Emphasis added.) (*Fort Wayne Books, Inc. v. Indiana,* 489 U.S. at 63-64, 103 L. Ed. 2d at 51-52, 109 S. Ct. at 927.)

These same concerns render invalid the search conducted on defendant's bookstore.

As noted above, large scale confiscations of books and films have been invalidated by the Court where the seizure has occurred *prior to an adversarial hearing* on the obscenity of the materials. (*A Quantity of Books,* 378 U.S. 205, 12 L. Ed. 2d 809, 84 S. Ct. 1723; *Marcus v. Search Warrant of Property* (1961), 367 U.S. 717, 732, 6 L. Ed. 2d 1127, 1136, 81 S. Ct. 1708, 1716.) As there was no adversarial hearing on this issue prior to the execution of the search in this case, our initial focus turns to the number of magazines seized from the store's premises.

The evidence is undisputed that multiple boxes from the van were delivered to the store premises and ''seized'' within the meaning of the fourth amendment. (*Maryland v. Macon* (1985), 472 U.S. 463, 469, 86 L. Ed. 2d 370, 377, 105 S. Ct. 2778, 2782.) Testimony at trial revealed that between four and five boxes were removed from the store premises and a picture of the dolly in the store introduced at the hearing on the motion to suppress shows five boxes. The officers conducting the search of the bookstore intercepted delivery of five boxes of magazines, opened one or two of the boxes, and eventually removed all the boxes from the store.

It is impossible to determine the exact number of magazines contained in the boxes removed from the store, as the magazines in these boxes were not inventoried separately from the magazines in the boxes removed from the van. However the evidence shows that a

total of approximately 1,500 magazines were inventoried from these two groups of boxes, with an average of 113 items in each box. Therefore, a total of approximately 565 magazines were contained in the boxes removed from the store in addition to the 155 magazines removed from the store's shelves.

A total, then, of over 700 magazines were seized from the store's premises. The seizure of a single book or copy of a film, pursuant to a warrant issued after a determination of probable cause by a neutral judicial officer, followed by a *prompt* judicial determination of the obscenity issue in an adversarial proceeding, is constitutionally permissible. However, the seizure of over 700 magazines raises concerns that the search operated as a prior restraint of the dissemination of the materials rather than as means to obtain evidence of criminal activity, especially where, as here, the judicial determination of the obscenity issue in an adversarial hearing was had over two years later.

In addition to the large number of magazines removed from the store, there is ample evidence in the record to support the trial court's finding that "more than one copy was seized by the seizure of the boxes of magazines in the store, *in violation of the Heller standard*." (Emphasis added.) The warrant return executed for the boxes removed from the store revealed that multiple copies of the same title were seized. This was also true for the return executed for the magazines removed from the store's shelves. The following evidence was elicited from Doner, who testified that his role in the search of the store was to recover any evidence that might be on the premises:

"Q. Were the racks full when you went into the premises?

A. To the best of my knowledge, yes.

Q. I mean were they generally all filled up without any open gaps in them?

A. To the best of my recollection, I would have to say yes.

Q. What did they look like after you had determined which magazines to seize?

A. They looked empty."

Time and again, the Supreme Court has emphasized that *"a single copy of a book* or film may be seized and retained for evidentiary purposes based on a finding of probable cause." (Emphasis added.) (*Fort Wayne Books, Inc. v. Indiana,* 489 U.S. at 63, 103 L. Ed. 2d at 51-52, 109 S. Ct. at 927.) Clearly, leaving the bookstore "empty" of its magazines went beyond seizing and retaining publications for evidentiary purposes but instead was a confiscation aimed at removing publications, presumptively within first amendment protection, from circulation completely. (*Heller,* 413 U.S. at 492-93, 37 L. Ed. 2d at 754-55, 93 S. Ct. at 2794-95; see *New York v. P.J. Video, Inc.* (1986), 475 U.S. 868, 874-76, 89 L. Ed. 2d 871, 879-81, 106 S. Ct. 1610, 1614-16.) The same can be said for the seizure of the magazines in the boxes removed from the store.

Equally problematic is the subsequent handling of the magazines seized from the store. As noted above, the more than 550 magazines in these boxes were removed from circulation and kept in the sole possession of the police, in addition to the 155 magazines removed from the store's shelves. Clearly, the effect of this type of seizure was to suppress as a prior restraint the materials sold in the store.

What we have then is a situation where over 700 magazines were seized from the bookstore and impounded with the police. The complaint against defendant was not filed for 20 days after the search. There is no explanation given in the record for the delay just as

there is no explantion for the more than two years that elapsed between the filing of the complaint and the commencement of the trial. The complaint for a search warrant and supporting affidavits were executed on May 7, and the search warrant for the premises was signed and executed the same day. There was no opportunity for an adversarial hearing on the issue of obscenity prior to the issuance of the warrant and it was not litigated until trial, over two years later. In light of these facts alone, we believe that the search was constitutionally infirm in light of the Court's opinions in *Marcus, A Quantity of Books* and their progeny.

Although the trial court recognized that the search went beyond the scope permitted by the Constitution and articulated in Supreme Court opinions, it concluded that the "voluntary return" of the boxes removed from the store sufficiently purged any infirmities from the search as did the court's conclusion that police "inadvertently" seized multiple copies of titles taken from the store's shelves. We disagree.

"Whether a Fourth Amendment violation has occurred 'turns on an *objective* assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' [citation] and *not* on the officer's actual state of mind at the time the challenged action was taken. [Citation.]" (Emphasis added.) (*Maryland v. Macon*, 472 U.S. at 470-71, 86 L. Ed. 2d at 378, 105 S. Ct. at 2783.) Regardless of whether the police returned the boxes taken from the store or whether the seizure of multiple copies from the store's shelves was inadvertent, the result was that "a great number" of magazines were removed from circulation for an extended period of time before an adversarial hearing on the obscenity issue was held. *Kimmel*, 34 Ill. 2d at 583.

The Supreme Court has not yet extended the "good faith exception" to the constitutionality of a search for

materials presumptively protected by the first amendment (see, *e.g., Marcus*, 367 U.S. at 730-31, 6 L. Ed. 2d at 1135, 81 S. Ct. at 1715; *A Quantity of Books*, 378 U.S. at 211-12, 12 L. Ed. 2d at 813, 84 S. Ct. at 1726) and we decline to do so here. Our obligation is not to determine whether the seizure of the boxes or the multiple titles was "inadvertent" or to guess at the officer's "actual state of mind" at the time of the seizure. (*Maryland v. Macon*, 472 U.S. at 470-71, 86 L. Ed. 2d at 378, 105 S. Ct. at 2783.) Rather, ours is to examine the record and determine whether the search and seizure that was executed was reasonable. Our review of the record leads us to conclude that it was not.

From our review of the record, it is patently obvious that after seizing the magazines taken from the store's premises, the police culled through the materials, deciding which could be used as the basis of the complaint against defendant. Various magazines from both sets of boxes, those removed from the store's premises and those removed from the van, were then combined and introduced, over defendant's objection, at trial. To allow the police to "voluntarily return" items seized in the search in an effort to save the entire search has no basis in the Supreme Court's opinions or in this court's and we decline to create new inroads in this area, particularly where none are merited.

Moreover, we note, as did defendant in arguments before this court, that there was no evidence presented at the suppression hearing or the trial that the boxes removed from the store were returned. In fact, a box of 44 magazines representing single copies of a combination of the magazines taken from the boxes removed from the store as well as from the van were introduced at trial. Testimony at trial revealed that two weeks after seizure, Novay had combined the magazines in this fashion.

Our conclusion that all the materials seized pursuant to the search must be suppressed finds support in this court's decision in *People v. Kimmel* (1966), 34 Ill. 2d 578. In *Kimmel*, in an opinion authored by Justice Schaefer, this court evaluated a search conducted in defendant's bookstore. The warrant for the search named four books purchased from defendant's bookstore and commanded the seizure of "all copies" of the books that might be found in the store. (*Kimmel*, 34 Ill. 2d at 580.) At the conclusion of the search, executed by at least four policemen and two assistant State's Attorneys, nearly 1,500 books and magazines had been seized and over 130 titles were taken.

This court concluded that although the officers who executed the search did not have a general warrant, "they treated the warrant that they had as a license for a general search, and they took advantage of their presence in the bookstore to ferret out and seize whatever they considered to be contraband." (*Kimmel*, 34 Ill. 2d at 582.) This court reversed the convictions for the possession of books not named in the search warrant.

In addition, this court concluded that because the warrant authorized the seizure of a large number of books before the owner had an opportunity to litigate the issue of obscenity, his conviction on one of the books named in the warrant was also reversed. This court referred to the opinion in *A Quantity of Books* where "search warrants were used to suppress great numbers of books before their owners had an opportunity to litigate the issue of obscenity." (*Kimmel*, 34 Ill. 2d at 583.) Therefore, this court suppressed all the materials seized, even those copies of the books named in the warrant.

Here, the police officers conducted a wholesale seizure of a "great number" (*Kimmel*, 34 Ill. 2d at 583) of magazines depicting activities described in the warrant, rather than obtaining a single copy of such materials, be-

fore defendant was afforded an opportunity to litigate the question of obscenity. What this court stated in *Kimmel* applies to the matter now before us: "Such a sweeping restriction without a hearing can not, in our opinion, be squared with first amendment freedoms." *Kimmel,* 34 Ill. 2d at 584.

For the reasons contained above, we affirm that part of the judgment of the appellate court that reversed the judgment of the circuit court. We reverse, however, that part of the judgment that remanded this matter to the circuit court for further proceedings. The judgment of the circuit court is reversed.

*Appellate court judgment affirmed*
*in part and reversed in part;*
*circuit court judgment reversed.*