THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFF INIGUEZ, Defendant-Appellant.

First District (2nd Division)   No. 1—02—1182

Opinion filed October 18, 2005.

CAHILL, J., dissenting.

Rita A. Fry, Public Defender, of Chicago (Timothy J. Leeming, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Mary Boland, and Johanna Tracy, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON, delivered the opinion of the court:

Defendant Jeff Iniguez was convicted of first degree murder and aggravated battery. The trial court sentenced him to 40 years in prison for murder and a concurrent 5-year term for aggravated battery. On appeal, defendant contends: (1) the trial court erred in instructing the jury on the reliability of eyewitness testimony; (2) he was denied a fair trial by the admission of prejudicial and excessive gang evidence; (3) the indictment against him was deficient; (4) the State's eyewitness testimony was insufficient to prove his guilt beyond a reasonable doubt; and (5) the State failed to prove his guilt on a theory of accountability. We reverse and remand.

FACTS

Ian Bomkamp, Oscar Martinez, and defendant were tried together before a jury for the first degree murder and aggravated battery of Walter Warlyn. The following evidence was presented at their trial.

The victim's father, Roland Warlyn, testified he owned a building in Chicago that housed his catering business. The victim lived in the apartment in the building and worked at Roland's catering business.

Roland was aware that the victim was a heroin user and a member of a street gang. On December 16, 1998, Roland gave the victim permission to borrow a white Ford catering van to go out for the evening. When Roland arrived at work the following morning, he noticed the lights in the building had been left on and fast-food cups were lying on the floor. The victim did not show up for work. Roland learned later that day that his son had been killed.

Chicago police officer D. Finley testified that on December 17, 1998, he was dispatched to Legion Park to investigate a possible death. Finley arrived at Legion Park and saw the victim lying facedown. Finley could not feel a pulse on the victim and called for an ambulance. Once the victim's body was turned over, Finley noticed severe trauma to the victim's head and face and a bullet wound to the victim's temple. Finley also noticed a large tattoo on the victim's abdomen. Finley believed the tattoo represented membership in the Imperial Gangsters street gang. He found a set of Ford keys in the victim's pocket. A white Ford van parked approximately 100 yards from Legion Park matched the set of keys.

Chicago police officer Vito Ricciardi testified that he arrested Jill DeShon on a drug charge unrelated to this case in February 1999. After the arrest, DeShon told Ricciardi she had information relating to the victim's killing. Based on this information, Ricciardi began investigating Bomkamp, Martinez, and defendant.

DeShon testified that on the evening of December 16, 1998, she went to Legion Park with some friends. Bomkamp, a ranking member of the Simon City Royals street gang, was with DeShon in the park. DeShon left the park by herself to meet Bonnie Lopez at a nearby restaurant. DeShon brought Lopez back with her to the park where Bomkamp had remained. DeShon testified that at some point after returning to the park, Martinez, also a ranking member of the Simon City Royals gang, and defendant arrived. Martinez and defendant were accompanied by two men whom DeShon did not know. The group stayed at the park drinking alcohol and smoking marijuana. DeShon did not drink but she smoked some marijuana.

DeShon said the group left the park in Martinez's car at approximately 10 or 11 p.m. They drove around looking for drugs and eventually stopped at a social club. Although DeShon and Lopez were allowed to use the restroom, the doorman would not let the others inside the club. DeShon saw the victim at the door talking with Bomkamp, Martinez, defendant, and the two unknown men. The victim left the club with the group. DeShon got into Martinez's car with Martinez, defendant, Lopez, and the two men. DeShon saw the victim and Bomkamp leave in a white van. While in the car, DeShon heard defendant say they were going to beat up the victim.

The victim and Bomkamp followed the others to Legion Park. Once at the park, DeShon and Lopez sat down on a bench. The rest of the group stood nearby. DeShon saw Bomkamp, Martinez, defendant, and the two unknown men start hitting the victim with their fists. The victim fell to the ground and yelled for them to stop. The men then began kicking the victim. Bomkamp left the group and walked in the direction of a fence located near the park's perimeter. DeShon believed the Simon City Royals commonly hid guns near the fence. Bomkamp returned with a gun and shot the victim. After hearing the gunshot, DeShon told Lopez, who was drunk at the time, to stand. The women walked over to Martinez's car and got inside. Martinez, defendant, and one of the other men got into the car with them. The other man stayed behind and fired off more gunshots. DeShon saw Bomkamp go to the victim's van but did not see what, if anything, he did to the van. Bomkamp and the other shooter joined the rest of the group in the car and drove away. Defendant, DeShon, and Lopez were dropped off near DeShon's house. Defendant told DeShon not to say anything about what she had seen at the park.

DeShon said she was arrested by Officer Ricciardi on a drug charge on February 4, 1999. Approximately one week later, DeShon called Ricciardi and told him what happened on December 16, 1998. DeShon's mother convinced her to contact police after she was arrested. DeShon said she had not contacted police earlier because defendant had threatened her. DeShon testified that the police did not offer her a deal in exchange for her testimony against Bomkamp, Martinez, and defendant.

On cross-examination, DeShon admitted using a variety of drugs, including LSD, cocaine, mushrooms, PCP, Valium, amphetamines, and marijuana. DeShon admitted she had been arrested for unlawful use of a weapon and possession of a controlled substance with intent to deliver. After her arrest, she told police about the shooting. Deshon pleaded guilty to the charges, was placed on probation, and immediately broke the terms of her probation. She moved to Colorado and dropped out of a drug rehabilitation program. DeShon remained a fugitive until March 27, 2001.

DeShon denied telling police about the murder to get lenity on those charges. DeShon gave a written statement to police and testified before the grand jury. In both instances, she said she met the victim on the evening of December 17, 1998. When asked about her previous statement, DeShon testified she "did not know" the victim was found dead the morning of December 17, 1998. DeShon admitted she provided a time line of the shooting to police in February 1999, but did not remember telling a detective the victim was killed between 10 and 10:30 p.m.

Doctor Tae Lyong An, a forensic pathologist for Cook County, testified he performed an autopsy on the victim. Dr. An saw several abrasions and bruises on the victim's face and body. He also saw three gunshot wounds—two entry wounds and one exit wound. Tests showed that the victim had consumed cocaine, heroin, and alcohol before he was killed. Dr. An believed the victim's death was caused by multiple gunshot wounds.

Oscar Montanez testified he was a member of the Imperial Gangsters street gang and knew the victim as a fellow gang member. Montanez said members of his gang wear the colors black and pink and receive tattoos depicting the Imperial Gangster crown. Montanez testified that in the summer of 1998, he and the victim got into a street fight with members of the Simon City Royals. During the fight, the victim threw a can and injured a Simon City Royal member. Montanez said neither Bomkamp, Martinez, nor defendant was present during the fight.

Montanez testified that he was at the Bottoms Up Social Club on December 16, 1998, when the victim walked in with a group of Simon City Royals. There were also two women in the group. Montanez said the club was located inside Imperial Gangster territory and told the victim that the group could not enter. The victim told Montanez that "it was cool" and that he had grown up with the men in the group. Montanez argued with the victim and would not allow the group to come inside. The two women were allowed inside but only to use the restroom. Montanez saw the victim get into a white van and drive away with the group.

Bonnie Lopez testified she had known Bomkamp for several years and that he was a ranking member of the Simon City Royals. On December 16, 1998, Lopez was at a restaurant where she met Bomkamp and DeShon. She left with Bomkamp and DeShon and went to Legion Park. Martinez and defendant joined them there. Lopez did not recognize others in the park. After one hour, she went with Bomkamp, Martinez, DeShon, and defendant to a social club where they met the victim. Lopez and DeShon used the club's restroom, but the others were not admitted inside. Lopez returned to the park with Martinez, DeShon, and defendant.

Lopez admitted she was intoxicated at the time and did not remember seeing Bomkamp or the victim at the park. She lay down on a park bench and rested. She heard kicking, someone yelling for help, and a gunshot. After the gunshot, DeShon told Lopez to get up, and the two women walked back to Martinez's car. While walking, Lopez heard two more shots fired. She and DeShon got into the car and were joined by Martinez. He warned the two women not to say

anything about what happened and dropped them off near DeShon's house. Lopez denied discussing the events with DeShon. Lopez did not talk to police until February 1999, when they came to her house to ask about the victim's murder. Lopez said she did not contact police out of fear of what might happen to her.

Chicago police officer Joe Rodriguez testified he had worked as a gang crimes specialist for 26 years. Rodriguez was assigned to investigate the victim's murder. He arrested Bomkamp, Martinez, and defendant in connection with the investigation. Rodriguez identified several photographs of tattoos found on Bomkamp, Martinez, and defendant while they were in police custody. Rodriguez testified the tattoos represent the Simon City Royals street gang. Rodriguez also identified photographs of tattoos found on the victim's abdomen that represent the Imperial Gangsters street gang. Rodriguez said the two gangs were fighting in the latter part of 1998.

John Hart testified he was a forensic scientist employed by the Illinois State Police. Hart analyzed a fingerprint and a palm print lifted from the victim's white van. Hart matched both prints to print identification cards made by Bomkamp.

The defense called Chicago police officer Dwayne Johnson as a witness. Johnson testified he was assigned to investigate the victim's death. Johnson found a watch, bracelet, and piece of paper near the victim's body. These items were not inventoried or tested. Nor was testing performed on the jacket the victim wore at the time of the shooting. On December 17, 1998, the victim's father told Johnson he saw empty fast-food cups lying around when he arrived at work the morning after his son was killed. Johnson did not analyze the cups or search the area for fingerprints.

At the conclusion of trial, the jury found defendant guilty of first degree murder and aggravated battery. Defendant was sentenced to 40 years' imprisonment for first degree murder and a concurrent 5-year prison term for aggravated battery.

## DECISION

### I. Jury Instructions

#### A. IPI Criminal 4th No. 3.15

■ On appeal, defendant challenges the use of Illinois Pattern Jury Instruction, Criminal, No. 3.15 (Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000)) (hereinafter IPI Criminal 4th). At the time of defendant's trial, IPI Criminal 4th No. 3.15 read:

"When you weigh the identification testimony of a witness, you

should consider all the facts and circumstances in evidence, including, but not limited to, the following:

■ The opportunity the witness had to view the offender at the time of the offense.

[or]

■ The witness's degree of attention at the time of the offense.

[or]

■ The witness's earlier description of the offender.

[or]

■ The level of certainty shown by the witness when confronting the defendant.

[or]

■ The length of time between the offense and the identification confrontation." Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000).

The instruction has since been changed to omit the word "or" between each of the five factors. See Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. Supp. 2003).

Defendant contends the use of the word "or" between the factors improperly instructed the jury it could consider any of the five individual factors rather than all of the factors in evaluating DeShon's identification testimony. The State responds that defendant has waived the argument by failing to object to the instruction at trial or raise the issue in a posttrial motion. We agree. Defendant's failure to challenge the instruction at trial or in his posttrial motion forfeited review of the issue. See *People v. Harvey*, 211 Ill. 2d 368, 385, 813 N.E.2d 181, 192 (2004) (a defendant's failure to object at trial and to raise the issue in a posttrial motion operates as a waiver of the right to raise the issue as a ground for reversal on review).

We nonetheless review defendant's argument under the plain error doctrine. See *People v. Herron*, 215 Ill. 2d 167, 191, 830 N.E.2d 467, 482 (2005). In *Herron*, the Illinois Supreme Court found use of "or" between the factors of IPI Criminal 4th No. 3.15 rendered the instruction "ambiguous and misleading, regardless of any further comment on it by the State in its closing argument."[1] *Herron*, 215 Ill. 2d at 191, 830 N.E.2d at 482. The court said, "giving IPI Criminal No. 3.15 with the 'ors' is indeed plain error." *Herron*, 215 Ill. 2d at 191, 830 N.E.2d at 482. But that does not mean reversal of defendant's conviction is automatic. See *Herron*, 215 Ill. 2d at 192-93, 830 N.E.2d at 482-83. Defendant has the burden of showing the "evidence was so

---

[1]We reserved ruling in this case until the supreme court decided the jury instruction issue in *Herron* because we understood it would be outcome determinative.

closely balanced that the error alone severely threatened to tip the scales of justice against him." *Herron*, 215 Ill. 2d at 187, 830 N.E.2d at 479.

A case relying almost entirely on the self-contradictory testimony of a drug-using intoxicated witness who contacted the police two months after the killing, when she was facing two felony charges and was a fugitive for two years before testifying, hardly can be characterized as an odds-on favorite for the State. This was a close case. It would not take much to tip the scales one way or the other.

Given that setting, we find it reversible error to give the defective identification instruction, IPI Criminal 4th No. 3.15. See *Herron*, 215 Ill. 2d at 191, 830 N.E.2d at 482. Because the evidence was so closely balanced, the error "severely threatened to tip the scales of justice against" the defendant. Accordingly, we reverse his conviction and remand the cause for a new trial. See *Herron*, 215 Ill. 2d at 187, 830 N.E.2d at 479.

Because we are remanding for a new trial, we will consider other claims of error that could again surface.

## B. The Non-IPI Instruction on Witnesses Who Are Addicts

■ Defendant contends the trial court erred in refusing to give the jury a non-IPI addict instruction. The State responds that the trial court adequately instructed the jury on DeShon's credibility.

The decision of whether to give a non-IPI instruction rests within the sound discretion of the trial court. *People v. Simms*, 192 Ill. 2d 348, 412, 736 N.E.2d 1092, 1133 (2000). An abuse of discretion is committed only where there is no IPI instruction that applies to the particular subject. *Simms*, 192 Ill. 2d at 412, 736 N.E.2d at 1133. The trial court here instructed the jury as follows:

> "Only you are the judges of the believability of the witnesses and of the weight to be given the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

The parties on appeal mistakenly refer to this instruction as "IPI 3.12" but the instruction parallels IPI Criminal No. 1.02 (Illinois Pattern Jury Instructions, Criminal, No. 1.02 (4th ed. 2000)).

Defendant argues the above instruction alone was insufficient to instruct the jury on the reliability of DeShon's testimony. Defendant contends the jury should have been given his tendered federal pattern jury instruction relating to addict testimony. See 1A K. O'Malley, J.

Grenig, & W. Lee, Federal Jury Practice & Instruction, Criminal, No. 15.05 (5th ed. 2000). The instruction advises the jury that the testimony of a drug or alcohol abuser must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs or alcohol. See 1A K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice & Instruction, Criminal, No. 15.05 (5th ed. 2000).

While parties are entitled to cross-examine witnesses about drug use, they are not entitled to have the jury instructed on the unreliability of testimony by drug addicts. *People v. Armstrong*, 183 Ill. 2d 130, 146, 700 N.E.2d 960, 967 (1998). Nor is it reversible error to deny a tendered addict instruction where evidence of the addiction is before the jury. *People v. Steidl*, 142 Ill. 2d 204, 238, 568 N.E.2d 837, 851 (1991). " 'Jurors do not leave their common sense behind when they enter court, and even in the absence of cautionary instructions they will ordinarily be aware of the factors which make some witnesses unreliable.' " *Steidl*, 142 Ill. 2d at 238, 568 N.E.2d at 851, quoting *People v. Rollins*, 108 Ill. App. 3d 480, 488, 438 N.E.2d 1322, 1328 (1982).

The jury was informed of DeShon's drug addiction and drug use on the night in question. The defense used this evidence to discredit DeShon before the jury. An addict instruction would have placed undue emphasis on the evidence. IPI Criminal 4th No. 1.02, on the other hand, adequately informed the jury of the basis on which it should evaluate DeShon's testimony, including her ability to observe and her memory. The trial court did not abuse its discretion by refusing to give defendant's addict instruction.

C. IPI Criminal No. 3.17

■ Defendant contends the trial court erred in refusing to instruct the jury on the unreliability of accomplice testimony. Specifically, defendant challenges the trial court's refusal to use IPI Criminal 4th No. 3.17, which reads:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

An accomplice instruction should be given if there is probable cause to believe the witness was guilty either as a principal or under a theory of accountability. *People v. Cobb*, 97 Ill. 2d 465, 476, 455 N.E.2d 31, 35 (1983). An accomplice is one who could himself have been

indicted for the offense either as a principal or as an accessory. *Cobb*, 97 Ill. 2d at 476, 455 N.E.2d at 35. There was no evidence here that DeShon shot and killed the victim. Nor was there probable cause to believe she aided or abetted in the killing. DeShon was merely present at the scene of the crime—a fact insufficient to show probable cause of guilt under a theory of accountability. See *People v. Cooper*, 194 Ill. 2d 419, 434, 743 N.E. 2d 32, 42 (2000). The trial court did not abuse its discretion in omitting IPI Criminal 4th No. 3.17.

II. Admission of Gang Evidence

■ Defendant contends the introduction of prejudicial gang evidence denied him a fair trial. He contends evidence of a street fight between the victim and a Simon City Royals gang member should not have been admitted to show motive because there was no indication Bomkamp, Martinez, or defendant knew about the fight. Defendant also contends the amount of gang evidence admitted at trial was excessive, especially Officer Rodriguez's testimony about the general organization of gangs, including the Imperial Gangsters and Simon City Royals, gang colors, symbols, hand signals, and the tattoos found on Bomkamp, Martinez, defendant, and the victim.

We will reverse a conviction based on the admission of gang evidence only if the trial court abused its discretion in admitting it. *People v. Johnson*, 208 Ill. 2d 53, 102, 803 N.E.2d 405, 433 (2003). Gang evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. *Johnson*, 208 Ill. 2d at 102, 803 N.E.2d at 433. "Evidence of gang affiliation is relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Johnson*, 208 Ill. 2d at 102, 803 N.E.2d at 433.

In this case, the State inundated the jury with evidence about street gangs. Joe Rodriguez, whom the prosecution referred to as "Gang Specialist Rodriguez," gave the jury an in-depth lesson on street gangs in Chicago, describing their structure, territories, and alliances. He covered every topic from the colors gang members wore to the graffiti symbols they use to mark their territory. He also reviewed 19 photographs introduced by the prosecution. Each photograph depicted tattoos belonging to Bomkamp, Martinez and defendant. Rodriguez testified how each tattooed symbol represented gang membership.

Officer Ricciardi also testified at length about Chicago street gangs, their territories, colors, and allegiances. Another officer testified about defendant's tattoos, several of which included the words "Simon City Royals."

The prosecution's opening statement and closing argument were peppered with references to gangs. The assistant State's Attorney referred to defendant's gang, its colors, hand signs, and tattoos. Twice, he argued the victim's participation in an earlier gang fight was defendant's motive to commit murder.

Although this extensive amount of gang evidence was allowed, there was no evidence the defendant was aware of the so-called motivating fact—a street gang fight six months before the killing. See *People v. Smith*, 141 Ill. 2d 40, 56-57, 565 N.E.2d 900, 906-07 (1990). The effect, if not the purpose, of the gang evidence was to stir the emotions of the jury. Probative value was virtually nil. We find the admission of this evidence was reversible error.

III. Validity of the Indictment

■ Defendant contends counts I and II of the indictment are void because they allege duplicitous mental states. Defendant also maintains count III of the indictment, which charges felony murder, is void because it is premised on aggravated battery. Our review is *de novo*. See *People v. Edwards*, 337 Ill. App. 3d 912, 921, 788 N.E.2d 35, 43 (2002).

Count I of the indictment charges that defendant committed first degree murder in that he, without lawful justification, "intentionally *or* knowingly" shot the victim with a gun in violation of section 9—1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/9—1(a)(1) (West 1998)). (Emphasis added.) Count II charges that defendant committed first degree murder in that he, without lawful justification, "shot and killed [the victim] with a gun knowing that such shooting with a gun created a strong probability of death or great bodily harm to [the victim]" in violation of section 9—1(a)(2) of the Code (720 ILCS 5/9—1(a)(2) (West 1998)). Defendant contends both charges are void because they are duplicitous.

Duplicity occurs when two or more distinct offenses are joined in the same count of an indictment. *Edwards*, 337 Ill. App. 3d at 921, 788 N.E.2d at 43. An indictment is not duplicitous if it charges a single offense in more than one way or pleads different acts contributing to the ultimate charged offense. *Edwards*, 337 Ill. App. 3d at 921, 788 N.E.2d at 43. A duplicitous indictment does not set forth the nature and elements of the charge with certainty, rendering the complaint void. *Edwards*, 337 Ill. App. 3d at 921, 788 N.E.2d at 43.

Counts I and II of defendant's indictment are not duplicitous. They charge defendant with distinct offenses: first degree murder under section 9—1(a)(1) of the Code and first degree murder under section 9—1(a)(2) of the Code. There has been no joining of offenses in separate charges.

The cases relied on by defendant are distinguishable. See *People v. Eagle Books, Inc.*, 151 Ill. 2d 235, 602 N.E.2d 798 (1992); *People v. Capitol News, Inc.*, 137 Ill. 2d 162, 560 N.E.2d 303 (1990); *People v. Heard*, 47 Ill. 2d 501, 266 N.E.2d 340 (1970). The supreme court in those cases held an indictment that charges a defendant in the disjunctive is void if it alleges disparate and alternative acts, any one of which would constitute the offense. *Eagle Books*, 151 Ill. 2d at 244-45, 602 N.E.2d at 801-02; *Capitol News*, 137 Ill. 2d at 174-75, 560 N.E.2d at 308-09; *Heard*, 47 Ill. 2d at 504, 266 N.E.2d at 342. Counts I and II of defendant's indictment use the disjunctive to allege defendant's mental state. They do not allege disparate and alternative acts. Use of the disjunctive in these circumstances did not cause uncertainty or conjecture as to the crime defendant was charged with committing. *People v. Viser*, 62 Ill. 2d 568, 580, 343 N.E.2d 903, 909 (1975) (indictment charging alternative mental states for murder does not implicate duplicity concerns).

Because we find counts I and II were properly charged, we need not consider defendant's argument with respect to count III—felony murder. See *People v. Cardona*, 158 Ill. 2d 403, 411, 643 N.E.2d 720, 723 (1994) ("[a] general finding of guilty is presumed to be based on any good count in the indictment to which the proof is applicable").

Additionally, because we are reversing defendant's conviction and remanding this cause for a new trial, we do not decide defendant's remaining contentions regarding the sufficiency of the State's eyewitness evidence or its alleged failure to prove his guilt on a theory of accountability. We remand because we find there is sufficient evidence to support a guilty verdict.

CONCLUSION

For the above-stated reasons, we reverse defendant's conviction and remand the cause for a new trial.

Reversed and remanded.

BURKE, J., concurs.

JUSTICE CAHILL, dissenting:

I respectfully dissent. The appellate muddle over IPI Criminal 4th No. 3.15 was resolved by our supreme court in *People v. Herron*, 215 Ill. 2d 167, 830 N.E.2d 467 (2005), as the majority correctly notes. Giving the instruction in its old form has been held to be plain error under *Herron*, reduced to harmless error only if the evidence is not closely balanced. The majority then finds the evidence closely balanced

in this case because "the self-contradictory testimony of a drug-using intoxicated witness" was the principal evidence introduced by the State. 361 Ill. App. 3d at 814. In fact, the only evidence offered by the defendant was the attempted impeachment of the credibility of that witness. So it could be argued from this record that the evidence is not closely balanced: the drug-using intoxicated witness stuck to her story in the face of withering cross-examination by brilliant defense counsel under the glare of juror scrutiny.

The majority criticism of gang crimes evidence is equally unpersuasive. The evidence offered by the State was within the boundaries announced in *People v. Johnson*, 208 Ill. 2d 53, 803 N.E.2d 405 (2003), and in keeping with the right of the State to show motive for otherwise inexplicable acts. The record reveals a senseless gang rivalry, punctuated by ruthless responses to perceived slights. Of course it is prejudicial. But it is also probative and the jury had a right to hear about this apparently senseless assassination in context. To shield a jury from the State's theory of the case hardly creates an even playing field for a criminal trial.

This defendant received a fair trial. I would affirm.