THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WAYNE EDWARDS *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 1—98—0444, 1—98—0445, 1—98—1928, 1—98—2095, 1—01—0497, 1—01—0779 cons.

Opinion filed November 26, 2002.—Rehearing denied April 28, 2003.

914

Thomas Peters, of Chicago, for appellant.

Rita A. Fry, Public Defender, of Chicago (Mark Floyd Pasterski, Assistant Public Defender, of counsel), for appellant.

Michael J. Pelletier and Michael C. Bennett, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Jon J.

Walters, Ash L. Sawkar, Mary L. Boland, and Shannon B. Rigby, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendants, Wayne Edwards, Ayodele Fayaode, Afolobi Animashawn, and Andre Nelson, were found guilty of criminal drug conspiracy. Edwards, Fayaode and Nelson were sentenced to 30 years in prison, while Animashawn received a prison sentence of 25 years. On appeal, defendants contend that their indictment was duplicitous and that the nonconsensual eavesdropping orders granted by the trial court were unconstitutional. Edwards, Fayaode and Animashawn further contend that the State did not prove all of the elements of conspiracy listed in the indictment, that their sentences were excessive, and that the trial court erred in not issuing proper jury instructions and in permitting the introduction of nonexpert testimony. Nelson alone argues that the trial court erroneously allowed the introduction of a prejudicial videotape, and that his mittimus is incorrect. Edwards appeals the dismissal of his postconviction petition. Several of these issues are discussed in the nonpublishable portion of this opinion.

## BACKGROUND

Defendants and 15 other codefendants were charged with multiple counts of criminal drug conspiracy under indictment number 94 CR 16717. The indictment arose from an investigation into drug sales by the Black Souls street gang on the west side of Chicago. The investigation was conducted by the Drug Enforcement Agency, the Internal Revenue Service and the Chicago police department. It included visual surveillance in the area of Walnut Street and Homan Avenue, and visual and telephone surveillance of a residence located at 1346 N. Kildare Avenue.

In March 1993, the police were granted two court orders allowing the use of pen registers and caller identification trap and trace devices. The devices were to display numbers dialed to and from a telephone located at the Kildare residence, which was registered to Crystal Bennett, and a cellular telephone registered to German Forero. Each order was for a period of 60 days and was subsequently extended for additional 60-day periods.

In July 1993, the State's Attorney's office authorized three applications for consensual eavesdropping devices. The authorizations were signed by the deputy State's Attorney, an assistant State's Attorney, and the chief of the narcotics bureau.

In September and October 1993, the police obtained two more court orders for the use of pen registers and trap and trace devices on

a telephone located at Edwards' apartment on Sheridan Road and a second telephone number registered to Crystal Bennett at the Kildare house. These orders were also for 60-day periods.

On November 12, 1993, the trial court entered two nonconsensual electronic surveillance orders, allowing the interception of telephone calls made to and from the Kildare residence and to and from the cellular telephone listed to German Forero. The orders were each for a period of 30 days, and the State's Attorney's office was required to submit progress reports to the court every 10 days while conducting the eavesdropping.

In December of the same year, the trial court entered a court order allowing the use of a pen register for 60 days on a second cellular telephone registered to German Forero. The court subsequently entered a nonconsensual electronic surveillance order for that cellular telephone. Pursuant to these orders, the Chicago police recorded over 1,000 telephone calls.

On June 6, 1994, a grand jury returned a multicount indictment against defendants. Count I, for criminal drug conspiracy, alleged that defendants conspired to commit the offenses of: (1) possession with the intent to deliver and delivery of 400 grams or more but less than 900 grams of a substance containing heroin; (2) possession with the intent to deliver and delivery of 15 grams or more but less than 100 grams of a substance containing heroin; (3) delivery of 10 grams or more but less than 15 grams of a substance containing heroin; and (4) delivery of less than 10 grams of a substance containing heroin. The only other count of the indictment relevant to this appeal is count VIII, which alleged that defendants Fayaode and Animashawn committed the offense of possession with intent to deliver 400 grams or more but less than 900 grams of a substance containing heroin.

The indictment specifically alleged that Edwards organized and supervised the wholesale and street-level retail distribution of heroin for the Black Souls street gang. Edwards allegedly employed workers who arranged meetings with customers seeking to purchase heroin, and he oversaw the procurement, cutting, packaging and distribution of the heroin. One of the workers who reported to Edwards was Nelson. Nelson allegedly conducted the activities of the narcotic organization out of the Kildare residence. Edwards and Nelson procured the heroin from suppliers, two of whom were Fayaode and Animashawn. Count I alleged numerous acts the various defendants committed in furtherance of the conspiracy.

A trial was held with two juries, one jury for defendant Nelson and a second for the other defendants appealing in this consolidated case. At trial, Chicago police officer Sal Colello testified that, as part of

the investigation, he regularly drove through the area of Walnut Street and Homan Avenue to observe patterns of activity. He testified that numerous people gathered in the street in the area. He observed people acting as "lookouts" by announcing the arrival of police, and others acting as "security," ensuring that drug sales ran smoothly. Colello also saw people standing in line to purchase tinfoil packets of heroin and witnessed hand-to-hand sales of the tinfoil packets. On October 14, 1993, Colello videotaped the narcotic sales activity in the Walnut-Homan area. The videotapes were published to the jury and were described by Officer Colello.

Miguel Mendez, a cellular telephone salesman, testified that he programmed two cellular telephones for Fayaode. Fayaode paid Mendez to put the contracts in the name of Mendez's nephew, German Forero. The telephone bills would be delivered to Forero's address, but Fayaode would pay the bills in cash. The telephones were activated in December 1992 and June 1993. Mendez also sold a cellular telephone to Animashawn in Animashawn's own name.

Chicago police officer Lee Bielecki testified that he had been a police officer for 12 years. For the past five years he had been assigned to the narcotics section of the Chicago police department. For the seven years before that, he had been assigned to the 11th district, which included the Walnut-Homan area. Officer Bielecki stated that he was a patrol officer and, later, a tactical officer in the 11th district. He had been involved in several major and mid-level narcotic investigations, and over 1,000 street-level investigations during his career. Over 100 of the street-level investigations specifically involved cocaine and heroin.

Following additional testimony about his experience in the Walnut-Homan area, the court qualified Officer Bielecki as an expert in the field of narcotics law enforcement, particularly with regard to drug trafficking in the Walnut-Homan area.

Officer Bielecki testified that he monitored the pen registers used in this case. In July and August of 1993, undercover officers making heroin purchases used cellular telephones to call codefendant Darryl Edwards' cellular telephone. The pen register showed corresponding calls between the officers and Darryl Edwards and between Darryl and the telephone at the Kildare residence. Hundreds of telephone calls were made to and from the Kildare residence on a daily basis. From the spring of 1993 to October 1993, police registered more than a few thousand calls.

The State published 124 audiotapes. Each contained an intercepted telephone call by one or more of the codefendants. The jury reviewed transcripts of the conversations while the audiotapes were played. Of-

ficer Bielecki testified that he determined the identities of the speakers on the audiotapes from the context of the conversations, the identification of the speaker by himself or another speaker, and his own familiarity with the voices. Prior to listening to the wiretaps, Bielecki had spoken with Nelson 50 to 75 times and with Edwards over 100 times. He heard Fayaode's voice for the first time during the wiretapping, but he testified Fayaode's voice was distinctive due to his accent. The officer had never spoken to Animashawn but had overheard his voice at the police station.

Officer Bielecki interpreted the terminology used in some of the recorded conversations. The officer testified that the conversations included: (1) Edwards speaking about the sale of 200 grams of heroin and stating that he would not pay the supplier until the drugs were sold; (2) Nelson speaking about "licks" (600 packets of heroin) and stating that they should have gotten 9 or 10 licks out of 200 grams; (3) Nelson discussing the mixing of heroin with other substances; (4) Nelson and Fayaode discussing $50,000 owed to Fayaode, and Nelson's request for 200 grams of heroin; (5) Edwards discussing a meeting concerning the sale of 100 grams of heroin; (6) Nelson being asked why certain heroin was not mixed with other substances prior to sale; (7) Fayaode telling Nelson he wanted to bring 400 grams, not just 300 grams; (8) someone telling Nelson that he sold half his lick; (9) someone telling Nelson that he had already collected $2,400 from the lick he was selling; (10) Nelson telling someone he did not need to purchase any drugs at that time; (11) Nelson discussing drug deliveries made by Fayaode and stating that they would give all the Walnut-Homan salesmen fresh licks to sell; (12) someone telling Nelson he was going to mix heroin with another substance; (13) Nelson and Fayaode discussing the delivery of 500 grams of heroin; (14) Animashawn stating that if he got the heroin cheaper from his supplier, he would sell it for a lower price; (15) Nelson discussing the fact that the police had the Kildare residence under surveillance; and (16) Nelson telling someone to clean up evidence of drug paraphernalia in the house.

Chicago police officer Maurice Barnes testified that on October 14, 1993, he made an undercover narcotic purchase in the Walnut-Homan area. He purchased two tinfoil packets for $20 from Black Soul member David Robinson. Robinson was arrested, and the packets were found to contain .14 grams of heroin.

On November 16, 1993, the police intercepted a telephone conversation between codefendants Tommiwa Kolly and Darryl Edwards, during which they discussed the delivery of 500 grams of heroin. Chicago police officer Jude Evans testified that, on that same

date, he was assigned to stop a car seen leaving the Kildare residence and identify the driver. Evans stopped the car for a traffic violation and the driver, Tommiwa Kolly, provided him with an Illinois identification card. Evans saw large sums of money on the floor of the car. Kolly told Evans the money "must be" John's, the owner of the car, but he did not know John's last name or address. The money was impounded, and Evans told Kolly he would have to follow him to the police station to obtain a receipt. On the way to the station, Evans saw Kolly using his cellular telephone. Once at the station, Kolly drove through the parking lot and left. He did not return for the receipt or the money.

On November 17, 1993, the police recorded a telephone conversation between Fayaode and Nelson, who was using the telephone at the Kildare residence. Nelson told Fayaode to come pick up some money. Fayaode said he would tell "Tony" to do it. Surveillance established that Animashawn arrived at the Kildare residence shortly after the conversation. Animashawn entered the residence and soon departed carrying a paper bag. Surveillance officers saw Animashawn and Fayaode drive to Fayaode's 211 East Ohio Street residence. Fayaode took the paper bag inside.

Officer Barnes testified that on November 23, 1993, he detained a car driven by codefendants Terrell Freeman and Vincent Reed. Barnes found a large plastic bag of tinfoil packets hidden in a side panel of the car. Freeman and Reed were not arrested, but the bag was confiscated. The substance in the bag weighed 41.6 grams and contained heroin. Barnes testified that the police stopped the car to generate conversation on the wiretaps.

Officer Bielecki testified that the police intercepted a number of telephone conversations connecting Freeman to the conspiracy, including: (1) codefendant Bryant Boyd telling Freeman to come to Kildare to get a lick; (2) Freeman telling Boyd the police took the lick; (3) Nelson and Boyd talking about the lick taken from Freeman; and (4) Freeman talking to Edwards about being stopped by the police.

Chicago police officer James Spratte testified that on November 24, 1993, he stopped a car occupied by Fayaode and Animashawn. Spratte searched the car and seized a shoe box containing 497.96 grams of heroin. A telephone conversation was later intercepted in which Nelson and codefendant Darryl Edwards discussed Fayaode's arrest while in possession of 500 grams of heroin. Another conversation was intercepted in which Nelson discussed Fayaode's bail. Someone subsequently provided $40,000 in cash for Fayaode and Animashawn's bond. A narcotics-sniffing dog alerted on the drawers containing the cash.

Officer Spratte further testified that on December 1, 1993, he arrested codefendant Remmy Baker on an outstanding warrant. He followed Baker from the Kildare residence and seized $3,000 and 73.87 grams of heroin from his car. A telephone conversation had been intercepted that same day during which Baker told Darryl Edwards he was bringing some heroin to the Kildare house.

On December 9, 1993, Chicago police officers Betty Coleman and Sharon Wise made an undercover purchase of a tinfoil packet in the Walnut-Homan area. The seller was arrested and identified as Moise Stamps. There was no testimony that Stamps was a Black Souls member. The packet weighed .07 grams and contained heroin.

In December 1993, Nelson and Edwards were arrested by the Chicago police. The Internal Revenue Service searched their residences. Items seized from Edwards' home included a Mercedes Benz automobile, $6,890 in a paper bag, $680 in a closet, $13,848 in a shoe box, numerous items of jewelry, a cellular telephone, a piece of paper displaying Fayaode's pager number, a traffic ticket belonging to Nelson, photo albums, and a telephone tap detection device. Among the items seized from Nelson's home were jewelry, cellular telephones, and a photo of Nelson, Fayaode, and Animashawn. The appraised value of the jewelry seized from both residences totaled over $50,000.

The jury found Edwards guilty of criminal drug conspiracy to deliver less than 10 grams of heroin. He was also found guilty of conspiring to possess 15 grams or more but less than 100 grams of heroin with the intent to deliver. He was acquitted of conspiracy to possess 400 to 900 grams of heroin with the intent to deliver. Edwards was sentenced to 30 years in prison.

The jury found Nelson guilty of criminal drug conspiracy to deliver less than 10 grams of heroin, to possess 15 grams or more but less than 100 grams of heroin with the intent to deliver, and to possess 400 grams or more but less than 900 grams of heroin with the intent to deliver. Nelson was sentenced to 30 years in prison and was fined $150,000.

The jury found Animashawn guilty of criminal drug conspiracy to possess with the intent to deliver heroin weighing 400 grams or more but less than 900 grams. He was acquitted of possession with the intent to deliver 400 grams or more but less than 900 grams of heroin. Animashawn was sentenced to 25 years in prison and was fined $150,000.

The jury found Fayaode guilty of criminal drug conspiracy to commit the offense of possession with intent to deliver 400 or more but less than 900 grams of heroin. He was found not guilty of possession with intent to deliver 400 grams or more but less than 900 grams of

heroin. Fayaode was sentenced to 30 years in prison and was fined $250,000.

Following his conviction, defendant Edwards filed a *pro se* petition for postconviction relief, alleging, among other things, that the trial judge penalized him for refusing a plea bargain. The petition was summarily dismissed.

Defendants appeal.

## ANALYSIS

### I. Duplicity of the Indictment and the Alleged Resulting Errors

Defendants first contend that count I of the indictment for criminal drug conspiracy was duplicitous because it alleged the commission of multiple offenses, which should have been alleged in separate counts. Defendants did not challenge the indictment until after trial. In the alternative, defendants Edwards, Animashawn and Fayaode argue that, if count I properly alleged a single conspiracy, the State did not prove them guilty of all of its elements as listed in the indictment. Defendants further contend that the jury should have been instructed of the possibility that there were multiple conspiracies. They argue that there was a fatal variance between the evidence at trial, which showed multiple conspiracies, and the single conspiracy alleged in the indictment. Defendants conclude that these errors caused the jury to return legally inconsistent verdicts.

### A. Duplicity of the Indictment

■ Duplicity occurs when two or more distinct offenses are joined in the same count of an indictment. *People v. Oaks*, 169 Ill. 2d 409, 444, 662 N.E.2d 1328 (1996), *reversed on other grounds by In re G.O.*, 191 Ill. 2d 37, 727 N.E.2d 1003 (2000). An indictment is not duplicitous if it charges a single offense in more than one way or if it merely pleads different acts contributing to the ultimate charged offense. *Oaks*, 169 Ill. 2d at 444; *People v. Johnson*, 231 Ill. App. 3d 412, 424, 595 N.E.2d 1381 (1992). A duplicitous indictment does not set forth the nature and elements of the charge with certainty, thereby rendering the complaint void. *People v. Heard*, 47 Ill. 2d 501, 505, 266 N.E.2d 340 (1970). Review of the sufficiency of a complaint is *de novo*. *People v. Moulton*, 282 Ill. App. 3d 102, 104, 668 N.E.2d 1078 (1996).

The United States Supreme Court has specifically found that a count alleging a multi-object agreement is not duplicitous:

> "The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.' [Citations]. *** The single agreement is the prohibited conspiracy, and however diverse

its objects it violates but a single statute ***." *Braverman v. United States*, 317 U.S. 49, 54, 87 L. Ed. 23, 28, 63 S. Ct. 99, 102 (1942). Numerous federal cases have also held that, even though an indictment may not charge multiple conspiracies in a single count, one count alleging a single conspiracy with multiple objects is not duplicitous. See *United States v. Campbell*, 279 F.3d 392, 397-98 (6th Cir. 2002) (indictment charging defendant with conspiracy to distribute marijuana, cocaine, and crack cocaine is not duplicitous); *United States v. Patterson*, 162 F. Supp. 2d 1017, 1019 (N.D. Ill. 2001) (indictment charging defendants with conspiracy to possess with intent to distribute *and* to distribute a controlled substance is not duplicitous); *United States v. Bruun*, 809 F.2d 397, 406 (7th Cir. 1987).

■ A person commits criminal drug conspiracy when:

"[W]ith the intent that an offense set forth in Section 401, Section 402, or Section 407 of this Act be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit such an offense unless an act in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator." 720 ILCS 570/405.1 (West 2000).

■ As in the cases cited above, count I in the instant case alleged that defendants committed the single offense of criminal drug conspiracy, thereby violating the single statute defined in section 405.1 of the Illinois Controlled Substances Act (720 ILCS 570/405.1 (West 2000)). The count simply enumerated four objects of that conspiracy: (1) delivery of and possession with intent to deliver 400 grams or more but less than 900 grams of a substance containing heroin; (2) delivery of and possession with intent to deliver 15 grams or more but less than 100 grams of a substance containing heroin; (3) delivery of 10 grams or more but less than 15 grams of a substance containing heroin; and (4) delivery of less than 10 grams of a substance containing heroin. This does not render the indictment duplicitous.

In addition, count I included great detail about the objects of the conspiracy. It sufficiently apprised defendants of the charges against them and allowed them to prepare their defense.

Defendants cite to *People v. Eagle Books, Inc.*, 151 Ill. 2d 235, 602 N.E.2d 798 (1992), *People v. Capitol News, Inc.*, 137 Ill. 2d 162, 560 N.E.2d 303 (1990), and *People v. Heard*, 47 Ill. 2d 501, 266 N.E.2d 340 (1970), for the proposition that disparate acts may not be alleged in the same count of an indictment. In *Eagle Books* and *Capitol News*, the Illinois Supreme Court found that offering for sale, selling, and delivering obscene materials were disparate acts, which could not be charged in the same count of an indictment. *Eagle Books*, 151 Ill. 2d

at 245-46; *Capitol News*, 137 Ill. 2d at 175. The *Heard* court similarly found an indictment to be duplicitous where it alleged the defendant set up, promoted or sold tickets for a "policy game" in violation of the Illinois gambling statute. *Heard*, 47 Ill. 2d at 504. Because these cases did not involve allegations of conspiracy, they are inapposite to the instant case. The federal cases cited above, which specifically held that it is not duplicitous to charge a defendant with criminal drug conspiracy in various ways, are more directly on point. As a result, we will adhere to the law as interpreted by those cases.

Although defendants were granted leave to cite the supplemental authorities of *People v. Nolan*, 332 Ill. App. 3d 215, 773 N.E.2d 105 (2002), and *People v. Gonzales*, 314 Ill. App. 3d 993, 743 N.E.2d 77 (2000), we find these cases do not support defendants' contention that the indictment was duplicitous.

For all of these reasons, we find that count I was not duplicitous.

■ Defendants Edwards, Animashawn, and Fayaode argue in the alternative that, if count I alleged one conspiracy, then the State did not prove all of the offense's elements. They contend that each of the four alleged objects of the conspiracy must be viewed as an essential element of the single crime.

It is well settled that a verdict of guilty for conspiracy to commit only one of a number of alleged offenses is sufficient to sustain a conviction. See *United States v. Pascarella*, 84 F.3d 61, 71 (2d Cir. 1996) (a court may affirm a conviction for conspiracy where the evidence showed that defendant committed only two out of the three aims of the alleged conspiracy); see also *United States v. Ross*, 131 F.3d 970, 984 (11th Cir. 1997), citing *Griffin v. United States*, 502 U.S. 46, 56-60, 116 L. Ed. 2d 371, 380-83, 112 S. Ct. 466, 472-75 (1991) (courts will uphold a general verdict for a multi-object conspiracy if the evidence was sufficient to support any of the alleged objects).

While count I in this case alleged one conspiracy to commit four acts, the jury was given separate verdict forms to determine defendants' guilt of conspiracy to commit each act. It was instructed that defendants were "charged in different ways with the offense of Criminal Drug Conspiracy" and that it would receive two verdict forms (guilty and not guilty) for each way the offense was charged. These instructions properly enabled the jury to find defendants guilty of criminal drug conspiracy without having to find they conspired to commit all four objects of the conspiracy. The State was not required to prove defendants conspired to commit all four objects of the conspiracy in order to sustain their convictions. *Griffin*, 502 U.S. at 56-57, 116 L. Ed. 2d at 381, 112 S. Ct. at 472-73.

## B. Proof of a Single Conspiracy v. Multiple Conspiracies

Defendants Edwards, Fayaode, and Animashawn next contend that there was a fatal variance between the indictment, which alleged a single conspiracy, and the evidence at trial, which established multiple conspiracies. They argue the jury should have received a proposed instruction on multiple conspiracies.

■ A defendant's allegation that there is a fatal variance between the indictment and the evidence at trial must be treated as a challenge to the sufficiency of the evidence. *United States v. Bullis*, 77 F.3d 1553, 1560 (7th Cir. 1996). Therefore, we will uphold the jury's determination that a single conspiracy existed if, in viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the conspiracy beyond a reasonable doubt. *Bullis*, 77 F.3d at 1560.

■ Where coconspirators agree to work in furtherance of a common goal or purpose, there is but one conspiracy. *Kotteakos v. United States*, 328 U.S. 750, 773, 90 L. Ed. 1557, 1571, 66 S. Ct. 1239, 1252 (1946); *Bullis*, 77 F.3d at 1560; *United States v. Varelli*, 407 F.2d 735, 741 (7th Cir. 1969). Although the parties to the agreement may change over time and there may be many transactions, this does not establish that there were separate conspiracies. *Varelli*, 407 F.2d at 742. In a single conspiracy, each defendant may perform a different function to further the illegal objective of the conspiracy. *United States v. Paiz*, 905 F.2d 1014, 1020 (7th Cir. 1990); *Varelli*, 407 F.2d at 742. Only where the conspirators have different interests and distinct goals will the court find the existence of multiple conspiracies. *Bullis*, 77 F.3d at 1560.

Federal courts have specifically found that an ongoing drug distribution conspiracy involving core members who buy and sell drugs to various suppliers, dealers and customers establishes a single common goal to distribute those drugs in violation of the law. *Paiz*, 905 F.2d at 1020. Although each drug transaction could be viewed as an agreement in and of itself, those separate agreements are geared toward the common goal of the drug distribution network. *Paiz*, 905 F.2d at 1020 n.4. In such cases, " 'separate agreements often form the basis for finding the existence of a single ongoing conspiracy.' " *Paiz*, 905 F.2d at 1020 n.4, quoting *United States v. Briscoe*, 896 F.2d 1476, 1507 (7th Cir. 1990). The integration of the separate agreements into a larger common plan with a common goal incorporates them into a single conspiracy. *Paiz*, 905 F.2d at 1020 n.4.

■ In this case, defendants shared the single, common goal of distributing drugs in the Walnut-Homan area. The continuation of that purpose throughout the conspiracy established that there was

only one conspiracy. See *Bullis*, 77 F.3d at 1560. Each of the defendants performed different functions to further the objective of distributing drugs in the area. Fayaode and Animashawn supplied the drugs, Edwards oversaw the distribution operation, and Nelson distributed the drugs to street salesman, while also conducting other activities out of the Kildare residence. There was no evidence that any of the defendants had a distinct interest or goal separate from the goal of his coconspirators.

In *Kotteakos v. United States*, the Supreme Court overturned the defendants' convictions, finding that, instead of proving a single conspiracy, the government proved eight or more different conspiracies. *Kotteakos*, 328 U.S. at 752, 90 L. Ed. at 1559, 66 S. Ct. at 1242. The defendants in that case were convicted of a single conspiracy to fraudulently obtain loans under the National Housing Act. However, the government failed to establish a connection between the various defendants, except that each had obtained a separate illegal loan through defendant Simon Brown. *Kotteakos*, 328 U.S. at 754, 90 L. Ed. at 1561, 66 S. Ct. at 1243. Each defendant had the individual purpose of obtaining his own loan and no common goal was proven. *Kotteakos*, 328 U.S. at 773, 90 L. Ed. at 1571, 66 S. Ct. at 1252.

In contrast, in *United States v. Paiz*, the defendants were convicted of conspiracy to distribute and possess with the intent to distribute marijuana. The defendants argued there was a variance between the indictment, which charged one conspiracy encompassing 117 overt acts, and the evidence at trial, which they alleged proved multiple conspiracies. *Paiz*, 905 F.2d at 1018. The court held that because the defendants had "knowingly embraced a common criminal objective," there was sufficient evidence to support the jury's determination that there was a single conspiracy. *Paiz*, 905 F.2d at 1020.

Like in *Paiz*, defendants here pursued an overall objective to distribute drugs in the Walnut-Homan area and committed numerous overt acts in pursuit of that objective. The drugs and money involved passed through many hands and each conspirator worked to keep the distribution network functioning. There was no evidence that any of the defendants had a separate goal. Each of them was involved in the network for an extended period of time and continued to perform his function in the network through numerous transactions. We find there was sufficient evidence to support the jury's finding of a single conspiracy, and there was no evidence that defendants were involved in multiple conspiracies. Therefore, there was no variance between the indictment and the evidence presented at trial.

■ Defendants further argue that the jury should have been instructed on multiple conspiracies. If the jury then found that

multiple conspiracies existed, rather than the one conspiracy alleged by the State, they would have been obligated to acquit defendants of criminal drug conspiracy.

The decision to give or refuse a non-Illinois Pattern Jury Instruction (IPI) is within the sound discretion of the trial court. *People v. Thomas*, 175 Ill. App. 3d 521, 528, 529 N.E.2d 1071 (1988). The court should instruct the jury on multiple conspiracies when there is a possibility of a variance between the indictment and the proof. *Varelli*, 407 F.2d at 746.

Because we have already found that there was no possibility of a variance in this case, the trial court did not abuse its discretion in refusing to give the non-IPI jury instruction.

## C. Legally Inconsistent Verdicts

■ Defendants Animashawn and Fayaode conclude that the duplicitous indictment and the court's refusal to instruct the jury on multiple conspiracies resulted in legally inconsistent verdicts. Although we have already rejected both of these arguments, we will address defendants' contention that the jury verdicts were legally inconsistent because they acquitted defendants of possession with intent to deliver 400 to 900 grams of heroin, but found them guilty of conspiracy based on the same offense.

A logically inconsistent verdict may stand, but a legally inconsistent verdict may not. *People v. Klingenberg*, 172 Ill. 2d 270, 274 (1996). Generally, a verdict that acquits and convicts a defendant of "crimes composed of different elements, but arising out of the same set of facts," is not legally inconsistent. *Klingenberg*, 172 Ill. 2d at 274. However, a fact finder may not conclude that the same essential element exists and does not exist. *People v. Hill*, 315 Ill. App. 3d 1005, 1011 (2000).

Verdicts that acquit a defendant of a predicate offense but convict him of a compound offense are legally inconsistent. *Klingenberg*, 172 Ill. 2d at 275. A predicate offense is one that is an essential element of another (compound) offense. *Klingenberg*, 172 Ill. 2d at 274. In determining whether a verdict is legally inconsistent, a reviewing court must look not only at the statutory definitions of the crimes charged, but also at the proof offered by the State at trial. *People v. Rhoden*, 299 Ill. App. 3d 951, 957 (1998).

In this case, defendants Fayaode and Animashawn were found guilty of the crime of criminal drug conspiracy, but not guilty of the completed crime that was the object of the conspiracy. Defendants incorrectly argue that the possession crime alleged in count VIII was a predicate offense of criminal drug conspiracy. The criminal drug

conspiracy statute does not require the completion of a predicate offense. One conspires to possess narcotics by agreeing to possess them and taking steps toward possessing them, not by completing possession. See 720 ILCS 570/405.1 (West 2000).

The Supreme Court has specifically found that "[a] conspiracy is not the commission of the crime which it contemplates, and neither violates nor 'arises under' the statute whose violation is its object." *Braverman*, 317 U.S. at 54, 87 L. Ed. at 28, 63 S. Ct. at 102. It is not necessary to sustain a conspiracy conviction to charge and prove as substantive offenses the overt acts listed in the conspiracy count. *Pinkerton v. United States*, 328 U.S. 640, 644, 90 L. Ed. 1489, 1495, 66 S. Ct. 1180, 1182 (1946). We find the verdicts here were not legally inconsistent.

Defendants further argue that the verdicts were legally inconsistent because Animashawn and Fayaode were convicted of conspiracy to possess and deliver between 400 and 900 grams of heroin, while Edwards, the alleged hub of the conspiracy, was not. We reject this argument for a number of reasons.

First, legal inconsistency occurs when the jury finds that the same essential element exists and does not exist, not when different defendants are convicted of agreeing to commit different acts in furtherance of an overall conspiracy. Second, this argument ignores the Illinois conspiracy statute, which specifically states that it is not a defense to conspiracy if a coconspirator was acquitted for the same offense. 720 ILCS 570/405.1(b) (West 2000).

Defendants cite *United States v. Varelli, United States v. Kotteakos,* and *Blumenthal v. United States*, 332 U.S. 539, 92 L. Ed. 154, 68 S. Ct. 248 (1947), for the propositions that the hub of a single conspiracy cannot be accountable for sales of fewer grams of narcotics than the spokes and that coconspirators are equally culpable for the acts of their leader. We find that none of the cases stand for these propositions. In fact, they state the opposite. The *Kotteakos* and *Varelli* Courts specifically held that it was improper for the trial court to instruct the jury that the acts or statements of one conspirator may be considered as evidence against any other defendant found to be a coconspirator. *Kotteakos,* 328 U.S. at 770, 90 L. Ed. at 1569, 66 S. Ct. at 1250; *Varelli,* 407 F.2d at 747. Similarly, the *Blumenthal* Court stated that the danger in conspiracy cases is the possibility that the jury will improperly attribute evidence against one defendant to the other defendants since they are tried jointly. *Blumenthal,* 332 U.S. at 559-60, 92 L. Ed. at 169, 68 S. Ct. at 257. Clearly these cases do not support defendants' argument.

Finally, we note that the jury did not have to believe the State's

argument that Edwards was the hub of the operation in order to convict defendants of criminal drug conspiracy. The evidence was sufficient to support Edwards' conviction even if he could not be personally linked to every cache of drugs recovered by the police. Because Animashawn and Fayaode were the alleged drug suppliers, it was logically consistent for the jury to believe that they handled larger amounts of drugs than their coconspirators. For these reasons, Edwards' acquittal for conspiracy to deliver between 400 and 900 grams was not legally inconsistent with Animashawn's and Fayaode's convictions.

## II. Pen-Register and Eavesdropping Orders

### Constitutionality of the Nonconsensual Electronic Surveillance Orders

Defendants contend that the three electronic surveillance orders entered pursuant to section 108B—3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/108B—3 (West 2000)) violated the Illinois Constitution. According to defendants, article I, section 6, of the Illinois Constitution permits law enforcement officers to conduct electronic surveillance only when one party to the conversation consents or "in the rarest and most extreme cases of necessity."

Article I, section 6, states:

> "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

The plain language of this section prohibits only *unreasonable* eavesdropping, not all nonconsensual eavesdropping. *Coryn v. City of Moline*, 71 Ill. 2d 194, 200, 374 N.E.2d 211 (1978) (the best indication of the intent of the framers of the Illinois Constitution is the actual language they adopted).

The Illinois Supreme Court has held that the protection against unreasonable searches and seizures afforded by article I, section 6, is the same as that provided by the fourth amendment of the United States Constitution. *People v. Tisler*, 103 Ill. 2d 226, 242, 469 N.E.2d 147 (1984). Therefore, the Illinois Constitution's protection against unreasonable searches is measured by the same standards as those used for the fourth amendment to the United States Constitution. *Tisler*, 103 Ill. 2d at 243.

The United States Supreme Court has expressly held that "under

sufficiently 'precise and discriminate circumstances,' a federal court may empower government agents to employ a concealed electronic device 'for the narrow and particularized purpose of ascertaining the truth of the ... allegations' of a 'detailed factual affidavit alleging the commission of a specific criminal offense.' " *Katz v. United States*, 389 U.S. 347, 355, 19 L. Ed. 2d 576, 584, 88 S. Ct. 507, 513 (1967), quoting *Osborn v. United States*, 385 U.S. 323, 329-30, 17 L. Ed. 2d 394, 399-400, 87 S. Ct. 429, 432-33 (1966); see also *Commonwealth v. Doty*, 345 Pa. Super. 374, 388, 498 A.2d 870, 877 (1985) (Pennsylvania constitutional guarantee against unreasonable searches and seizures serves only to prohibit a nonconsensual electronic interception without warrant or court order issued upon probable cause).

■ In Illinois, nonconsensual eavesdropping orders may be obtained pursuant to section 108B—3 of the Code of Criminal Procedure. Section 108B—3 provides:

"The State's Attorney, or a person designated in writing or by law to act for him and to perform his duties during his absence or disability, may authorize, in writing, an ex parte application to the chief judge of a court of competent jurisdiction for an order authorizing the interception of a private oral communication when no party has consented to the interception and (i) the interception may provide evidence of, or may assist in the apprehension of a person who has committed, is committing or is about to commit, a violation of *** Section 401, 401.1 (controlled substance trafficking), 405, *** or 407 of the Illinois Controlled Substances Act ***." 725 ILCS 5/108B—3 (West 2000).

Applications for nonconsensual eavesdropping orders must be made in writing, upon oath or affirmation, and must include the following: (1) the facts relied upon by the applicant; (2) a showing that there is probable cause to believe that the communication will occur at the particular place of interception; (3) the objective of the investigation; (4) a statement of the period of time for which the interception is required to be maintained; (5) a particular statement of facts showing that other normal investigative procedures have been tried and have failed, or reasonably appear unlikely to succeed if tried, or are too dangerous to employ; and (6) a statement of facts concerning all previous applications known to the applicant involving any person whose communication is to be intercepted. 725 ILCS 5/108B—4 (West 2000).

■ To enter an order for nonconsensual eavesdropping, the chief judge must determine from the application that: (1) there is probable cause to believe the person whose communication is to be intercepted is committing, has committed, or is about to commit an offense enumerated in section 108B—3; (2) there is probable cause to believe

that a particular communication concerning such offense may be obtained through the interception; (3) normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or are too dangerous to employ; and (4) the officers authorized to conduct the electronic surveillance are certified. 725 ILCS 5/108B—5 (West 2000).

We find the requirements in Article 108B provide for adequate judicial supervision and sufficiently protect a suspect's constitutional right to be free from unreasonable nonconsensual eavesdropping. Because the applications and orders in this case complied with the particular requirements of section 108B—3, defendants' assertion that the nonconsensual eavesdropping orders were unconstitutional is without merit.

Defendants further contend that section 108B—7 of the Code of Criminal Procedure (725 ILCS 5/108B—7 (West 2000)) violates the warrant clauses of article I, section 6, of the Illinois Constitution and the fourth amendment of the United States Constitution. Defendants argue the warrant clauses require particularity with respect to the things to be seized, but section 108B—7 gives officers unfettered discretion regarding the scope and length of time communications may be seized.

First, we agree with the trial court that the warrant clause contained in article I, section 6, of the Illinois Constitution does not apply to the interception of communications. The Illinois Constitution's warrant clause requires a finding of probable cause for warrants that seek to search a place and seize a person or thing. Ill. Const. 1970, art. I, § 6. The framers of the Constitution specifically rejected an amendment that would have made the warrant clause applicable to the interception of communications, stating that communications could not be described with the same particularity as specific items of evidence. See 6 Record of Proceedings, Sixth Illinois Constitutional Convention 1536—39.

In addition, section 108B—7 meets the particularity requirements of the fourth amendment. Section 108B—7(b) provides that interceptions may continue for the period of time necessary to achieve the objective of the authorization, as long as that period does not exceed 30 days. It further states that eavesdropping orders entered under the section must require the interception to begin and terminate as soon as practicable and be conducted in such a manner as to minimize the interception of communications not otherwise subject to interception. 725 ILCS 5/108B—7(b) (West 2000). The federal wiretapping statute uses practically identical language (see 18 U.S.C. § 2518(5) (2000)) and has been found constitutional by various federal courts (see *United*

*States v. Ramsey*, 503 F.2d 524, 526 (7th Cir. 1974); *United States v. Tortorello*, 480 F.2d 764, 775 (2d Cir. 1973) (Title III is not unconstitutional on its face); *United States v. Cox*, 462 F.2d 1293, 1303 (8th Cir. 1972); *United States v. Cox*, 449 F.2d 679, 684 (10th Cir. 1971)). As a result, Article 108B does not violate the warrant clauses of the Illinois and United States Constitutions.

Accordingly, the judgment of the circuit court is affirmed. As discussed in the nonpublishable portion of this opinion, we order the mittimus corrected to reflect defendant Nelson's conviction for criminal drug conspiracy.

Affirmed; mittimus corrected.

McBRIDE, P.J., and BURKE, J., concur.