2022 IL App (3d) 190499

Opinion filed February 24, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0499 Circuit No. 14-CM-1356 |
| | ) | |
| JAMES PANOZZO, | ) ) | Honorable Clark Erickson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justices Lytton and Schmidt concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        Defendant, James Panozzo, appeals following his conviction for violation of a "stalking

no contact order." 740 ILCS 21/125 (West 2012). Defendant argues that the trial court erred in

allowing the State to introduce evidence of his guilt of offenses not contemplated by the charging

instrument, resulting in the introduction of unduly prejudicial other crimes evidence. We reverse

defendant's conviction outright.

¶ 2                                    I. BACKGROUND

¶ 3        On September 12, 2013, a stalking no contact order was entered against defendant. The

order listed Robert Mysliwiec Senior (Robert) as the petitioner. Listed as additional protected

persons in the order were Robert's wife, Colleen Mysliwiec, and Robert's son, Robert Mysliwiec Junior (Robby). The order mandated that defendant refrain from contacting the Mysliwiecs, directly or indirectly.

¶ 4        On December 9, 2014, the State filed a one-count information in which it alleged that defendant had committed the offense of violating a stalking no contact order (*id.*) The information alleged that on July 23, 2014, defendant committed the offense in that he, "having been served with notice of the contents of a stalking no contact order, *** did intentionally commit an act which was prohibited by the order, in that said defendant made contact with Robert Mysliwiec." This is the second appeal related to that single charge.

¶ 5        Defendant proceeded *pro se* at the first bench trial. The evidence at trial established that Robert and Colleen lived two doors down from defendant. Robby lived in the house in between defendant and the elder Mysliwiecs. Robert testified to a history of "bad blood" between his family and defendant. Defendant frequently placed signs and displays in his yard that the Mysliwiec's believed were thinly veiled attacks on them. Testimony at trial was otherwise limited to a July 23, 2014, incident in which defendant yelled at Robby. Defendant and Robby presented conflicting accounts as to who instigated the altercation.

¶ 6        The court found defendant guilty and sentenced him to 10 days in jail and 18 months' probation.

¶ 7        In the first direct appeal, this court vacated defendant's conviction on the grounds that his waiver of counsel was not freely, knowingly, and intelligently made. *People v. Panozzo*, 2018 IL App (3d) 150794-U, ¶ 22.

¶ 8        Following remand, the parties first convened on March 26, 2018; defendant was represented by counsel. Following a series of continuances over the ensuing year, a jury trial was scheduled for April 8, 2019.

¶ 9                                        A. Motion in Limine

¶ 10        The jury was selected on April 8. The next day, the State filed a motion *in limine* requesting, for the first time, that it be allowed to introduce evidence "relating to course of conduct before July, 2014." In the motion, the State asserted that the stalking no contact order prohibited defendant from committing stalking and that the statutory definition of stalking "specifically mentions course of conduct."

¶ 11        In arguments on the motion, the State asserted that it planned to introduce evidence of "ongoing conduct from the date the [stalking no contact] order was entered *** up until the date of the charge." Specifically, the State intended to introduce evidence of an April 2014 altercation between defendant and Robert, as well as evidence of defendant's yard signs. Defense counsel objected, arguing that any conduct prior to the date of the charged offense was irrelevant and otherwise constituted inadmissible evidence of prior bad acts. The State continued to argue that because stalking was defined as a course of conduct, defendant's entire course of conduct was relevant. The court granted the State's motion, finding that any such evidence was helpful in "establishing a context."

¶ 12        Defense counsel then argued that the information was unclear in that it failed to specify whether the victim as Robert Mysliwiec Senior or Robert Mysliwiec Junior. Added counsel: "We don't even know who they're talking about." When asked by the court which Mysliwiec was the contemplated victim, the State responded that defendant had made contact with both in violation of the order. Counsel accused the State of "want[ing] it both ways" and insisted that he would

3

object at every such attempt. Counsel also opined that defendant's yard signs were speech protected by the first amendment. The court noted that it would "refer to it as an ongoing objection"; the court did not otherwise weigh in on the dispute or counsel's reference to the first amendment.

¶ 13                                    B. Trial Evidence

¶ 14        In its opening statement, the State asserted the defendant "engaged in a course of conduct that [it] would equate to terrorizing the Mysliwiecs."

¶ 15        Robert testified that in April 2014 defendant confronted him in a back alley and screamed at him. Robert continued: "I don't know if he had an ax in his hand or something in his hand. I don't remember." Defendant yelled at Robert for bringing him to court and told him "you better watch out." Robert testified that he was "scared to death" during the encounter.

¶ 16        Robert identified a series of photographs, dated May 31, 2014, of a display in defendant's yard. The display featured, among other things, a witch and a scarecrow. On the witch hung a sign that read "Marie"; on the scarecrow was a sign that read "If I only had a brain -Lou-." Robert testified that these were references to him and Colleen, as defendant had nicknamed them Lou and Marie. A sign elsewhere on the same display read "JR's sugar shack," which Robert testified was a reference to Robby. Another installation, shown in a photograph dated June 22, 2014, read "Landscaping for Idiots" and included signs that said "Lou," "Snitch," and "Narc." Robert opined that this was a reference to his and Colleen's failed attempt to plant trees on their property. Another sign read "Lunatic Lou" and "Mind your own business." Still another read "No trespassing This means you! Robby!" The signs were on defendant's property but visible over a six-foot fence from Robby's house.

4

¶ 17    On cross-examination, Robert conceded that there were a number of elements in defendant's displays, including the witch and scarecrow display, of which he did not understand the significance. With respect to the April run-in with defendant, counsel asked Robert a series of questions relating to whether the alley in which the encounter took place was private or public.

¶ 18    Robby testified that, one morning in July 2014, he was waiting to be picked up for work when defendant brought the witch display out of his house. Robby testified that he said "really," at which point defendant began berating him with name-calling and profanity. Robby was scared and called the police. He testified that defendant was on Robby's property when he was yelling at him.

¶ 19    Russell Belcher of the Kankakee County Sheriff's Office arrived on the scene after Robby's phone call. After being shown a copy of the stalking no contact order, Belcher approached defendant, who was in his home. Defendant told Belcher that he had only said to Robby: "[I]f you have something to say, say it to my face." Belcher testified that no one ever reported that defendant had been anywhere other than on his own property.

¶ 20    Following the State's case-in-chief, defense counsel requested a "directed finding" declaring that defendant's yard signs were protected by the first amendment. The result, counsel contended, was that the statute under which defendant was charged was unconstitutional as applied, at least insofar as the offense was based on his yard signs. The following colloquy ensued:

> "THE COURT: Okay. Well, why wouldn't you have raised that as a pretrial issue?
>
> [DEFENSE COUNSEL]: Well, Judge, I'm raising it now.

5

THE COURT: Well, okay, but now is a little bit untimely in terms of the flow of the trial.

I think that certainly you will have an opportunity should the case go against you to raise that issue in a posttrial motion.

Are we supposed to take all afternoon now and determine constitutional issues?"

¶ 21 In defendant's case-in-chief, Douglas Dunkin testified that he was standing at his mailbox on the morning of July 23, 2014, approximately four houses away from defendant's house, when he "heard some profanity come out of Robby's mouth." Dunkin added: "He was yelling at [defendant]." Defendant was not yelling at Robby.

¶ 22 Later that day, Dunkin engaged in a conversation with his mother, Robert, and Robby. Dunkin told Robert that Robby had started the altercation with defendant earlier. Robert denied it. However, Dunkin then asked Robby if he had started it, and Robby admitted that he had.

¶ 23 Susan Smith, who lived in the neighborhood, opined that defendant's displays were, in fact, references to Lou and Marie King, former neighbors with whom defendant had a friendly rivalry.

¶ 24 Defendant testified that he was moving the witch display into his yard on the morning of July 23, 2014. As he did, Robby yelled at him and called him a "fucking asshole." Defendant told Robby that he should watch his mouth, "or something in that order." Defendant denied threatening Robby, calling him any names, or going onto Robby's property. He further denied that his signs and displays contained references to the Mysliwiecs. Defendant offered no testimony relating to the April altercation with Robert.

¶ 25 C. Jury Instructions and Verdict

¶ 26    At the jury instruction conference, defense counsel insisted that the State make clear which Robert Mysliwiec the charge contemplated. The State again argued that the charge covered both, adding: "[I]t's the State's position that each occurrence that were [*sic*] testified to on April and July are both violations independent of each other."

¶ 27    Defense counsel strenuously objected, arguing that defendant had only been charged with one violation. He asserted that defendant did not know what he was accused of, given the ambiguity with respect to the identity of the victim. The following exchange ensued:

> "THE COURT: Well, we have—yeah, it's all a little bit vague because—
>
> [DEFENSE COUNSEL]: It's extremely vague.
>
> THE COURT: Well, I know, but you could have filed a bill of particulars. You didn't do that."

The court ruled that it would "let this stand" and that defense counsel could argue that defendant had not committed any of the alleged acts.

¶ 28    Next, the State added that defendant's signs and displays also constituted an independent violation. Defense counsel again argued that defendant's signs were protected by the first amendment. The court commented that defense counsel's first amendment claim was untimely, stating, "we can't decide it in five minutes of argument." It suggested a motion *in limine* would have been more appropriate. Nevertheless, the court acknowledged that three different acts had been alleged, and that in order to preserve defendant's first amendment claim, it would need to be made clear which act constituted the basis for any potential conviction. The court suggested issuing multiple special verdict forms for each of the three grounds on which the State claimed defendant violated the order.

¶ 29    In its closing argument, the State contended that defendant had committed three separate violations of the stalking no contact order.

¶ 30    The jury was subsequently given forms for three separate propositions (hereinafter, Proposition A, Proposition B, and Proposition C). Proposition A was that defendant violated the stalking no contact order by making contact with Robert. Proposition B was that defendant violated the stalking no contact order by making contact with Robby. Proposition C was that defendant violated the stalking no contact order by "making indirect written contact with [Robert] or [Robby]." The jury returned guilty verdicts on all three propositions.

¶ 31    Defendant filed a posttrial motion alleging, *inter alia*, that the State's newly added allegation pertaining to the April incident with Robert was raised for the first time outside of the 18-month statute of limitations for misdemeanors. In arguing the motion, counsel claimed that both Proposition A and Proposition C had been raised outside of the statute of limitations. He insisted: "I don't know why the State thinks they can simply add those in." Counsel concluded: "[T]he only one that we were aware of, the one we went to trial on was this comment to Robert Mysliwiec, Jr." The court denied the motion and sentenced defendant to 12 months' conditional discharge.

¶ 32                                      II. ANALYSIS

¶ 33    On appeal, defendant argues that the trial court erred in allowing the State to prove the single charge of violating a stalking no contact order through evidence of his April altercation with Robert (Proposition A) or his yard signs (Proposition C). He contends that the information did not provide adequate notice of a charge based on those facts.

¶ 34    Defendant does not dispute that he was properly on notice of a charge of violation of a stalking no contact order based upon the facts relating to his July altercation with Robby

8

(Proposition B). He concedes that the State's proof and the jury's finding of guilt with respect to that proposition were supported by the information. For that reason, defendant's argument on appeal is ultimately an other-crimes argument. He contends that because he was not actually charged with Proposition A or Proposition C, the evidence relating to those propositions was evidence of *other* crimes. Therefore, defendant argues, the evidence was inadmissible and this court must vacate his conviction.

¶ 35    Initially, the State asserts that defendant forfeited the instant issue by failing to raise it in a posttrial motion. We disagree. Defense counsel raised the untimeliness of the charge under Proposition A in his posttrial motion, and his raised the same issue concerning Proposition C at the subsequent hearing. While counsel suggested that the result was a violation of the statute of limitations, the underlying issue was precisely that which is raised on this appeal: that defendant had no notice of charges pertaining to his alleged April altercation with Robert or his yard signs until after the trial began. A posttrial motion will be deemed sufficient to preserve a claim of error where it alerts "the trial court to the alleged error with enough specificity to give the court a reasonable opportunity to correct it." *People v. Coleman*, 391 Ill. App. 3d 963, 971 (2009). Through his repeated trial objections, his written posttrial motion, and his arguments on that motion, defense counsel provided the court ample opportunity to correct the error presently asserted.[1]

¶ 36                            A. Sufficient Notice

---

[1]It is worth noting that, in any event, a conviction for an uncharged offense is a structural error for which relief may be granted under the second prong of the plain error doctrine. *E.g.*, *People v. Booker*, 2015 IL App (1st) 131872, ¶ 65; *People v. Clark*, 2014 IL App (1st) 123494, ¶ 41; *People v. McDonald*, 321 Ill. App. 3d 470, 472-74 (2001).

¶ 37	"A defendant in a criminal prosecution has a fundamental due process right to notice of the charges brought against him. [Citation.] For this reason, a defendant may not be convicted of an offense he has not been charged with committing." *People v. Kolton*, 219 Ill. 2d 353, 359 (2006). A charging instrument provides sufficient notice and therefore comports with due process requirements where it apprises the defendant of the crime charged and enables him to prepare his defense. *People v. Grieco*, 44 Ill. 2d 407, 409 (1970).

¶ 38	When reviewing the sufficiency of a charging instrument, the timing of a defendant's original challenge to the instrument determines the standard to be applied. *People v. Espinoza*, 2015 IL 118218, ¶ 23. Where a defendant challenges the sufficiency of the charging instrument prior to trial, dismissal is required if it does not strictly comply with the requirements of section 111-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3 (West 2018)). *Espinoza*, 2015 IL 118218, ¶ 23. When the instrument is challenged for the first time after trial, a defendant will attain relief only where he demonstrates that the instrument provided notice of the charge or charges that was so insufficient as to prejudice to the preparation of his defense. *Id.*

¶ 39	Insofar as defendant's argument can be characterized as a challenge to the charging instrument, defendant raised that challenge for the first time *during* trial.[2] Nevertheless, we need not determine which of the two standards applies here. Defendant does not contend that the information contained any statutory defects under section 111-3. Rather, he only argues that the information provided insufficient notice relating to Proposition A and Proposition C and that the lack of notice prejudiced him in the preparation of his defense.

_____

[2]There was no opportunity to raise a challenge prior to trial because the incidents forming the basis for Propositions A and C were not added until after the jury was selected and the trial had thus begun.

¶ 40        In *Espinoza*, our supreme court recently reaffirmed that the identity of the victim of an offense is an essential element that must be pled in the charging instrument. *Espinoza*, 2015 IL 118218, ¶ 20. The court observed that the requirement is founded upon the right of the accused to be free from double jeopardy and emphasized that "it is a substantial requirement designed to safeguard a constitutional right and is not a mere technical rule." *Id.* ¶ 17.

¶ 41        The victim contemplated in Proposition A was Robert Mysliwiec Senior. The information listed the victim as only Robert Mysliwiec. To be sure, the variance between these two names is minimal. However, case law dictates that a minor discrepancy concerning the name of the victim rises to a material ambiguity in the charging instrument where, based on the facts of the case, it creates a potential for mistaken identity. For instance, in *Bonardo v. People*, 182 Ill. 411, 424 (1899), while the indictment listed the victim as John Young Jr., each witness referred to him as Johnnie Young. Our supreme court held that such a variance was not fatal because "[t]he evidence does not show that there was any other person known as 'John Young, Jr.,' in the neighborhood where the killing occurred, or connected with the events which transpired on the evening of the killing." *Id.* Similarly, the court has held that a variance in name is not fatal where "there is no question of the identity of the victim as the person named." *People v. Jankowski*, 391 Ill. 298, 302 (1945).

¶ 42        While the variance in the victim's name in the information in this case was minor in form, it was massive in effect. Because the same stalking no contact order protected both Robert and Robby, and because defendant, at different points in time, had contacted each of them, the "Senior" or "Junior" designation was vital to providing defendant with proper notice of the identity of the victim, an essential element of the charge.

11

¶ 43    The information—as least as construed by the State—suffers from another, more fundamental defect as well, and one which applies equally to Propositions A and C. A charging instrument is void for duplicity where two or more distinct offenses are charged in a single count. *People v. Ross*, 21 Ill. 2d 419, 420-21 (1961). A duplicitous charging instrument is considered defective because it "does not set forth the nature and elements of the charge with certainty." *People v. Edwards*, 337 Ill. App. 3d 912, 921 (2002).

¶ 44    The information in this case was not duplicitous on its face; the lone charge contemplated a single victim on a single date. But the State, with the endorsement of the trial court, gave the information a duplicitous construction when it urged that the single victim listed therein referred to *both* Robert and Robby. Likewise, the notion contained within Proposition C that the victim could be Robert *or* Robby was also duplicitous. See *People v. Brown*, 259 Ill. App. 3d 579, 580 (1994) ("Where indictments use the disjunctive 'or' to join disparate and alternative acts, the performance of any one of which constitutes the offense, the indictments will be void for duplicity."). The State was explicit in insisting that defendant had committed the offense of violation of a stalking no contact order in three distinct and independent ways, against different victims. *Supra* ¶¶ 26-28. By pursuing each of these offenses through a single-count charge, the State was in violation of the bar on duplicity.

¶ 45    Even where a charging instrument is defective, it may nevertheless provide notice sufficient for the preparation of a defense and satisfaction of the due process requirement. See, *e.g.*, *People v. Kennebrew*, 2013 IL 113998, ¶ 53. Such was not the case here, as the errors discussed above plainly affected the defense.

¶ 46    Indeed, the misleading of defendant is not a matter of speculation, as the record well documents defense counsel's surprise at the State's revelation of two new charges after the trial

12

had already begun. Defense counsel appeared at trial and selected a jury under the belief that he was defending only against a charge related to the July 23, 2014, confrontation between defendant and Robby. Counsel's cross-examination of Robert regarding the April incident was limited to the ancillary—if not irrelevant—issue of ownership of the alley. Defendant did not even discuss the incident in his own testimony. Those facts cannot be particularly surprising, given that they did not know that incident would be an issue until after the trial started.

¶ 47        Similarly, defense counsel made clear on multiple occasions that the preferred defense regarding defendant's yard signs was a claim that they were a form of speech protected by the first amendment. At each turn, however, the court found counsel's argument to be untimely and suggested that counsel should have raised the issue in a pretrial motion. Yet, counsel was foreclosed from doing so because there had been no notice of such a charge until after the trial had started.

¶ 48        To that point, the surprise to defendant does not appear to have been an accident. Defendant's case had been pending following this court's remand for more than one year before his retrial. But the State did not divulge that it would introduce facts of the April altercation with Robert until after the trial had started.[3]

¶ 49        Of graver concern is the fact that, even then, defendant was provided no indication that the State was pursuing multiple independent findings of guilt. In arguing its motion, the State explained that it would need to introduce evidence of all three acts—the April altercation, the July altercation, and the yard signs—in order to show that defendant had engaged in a "course of

---

[3]If, as the State asserted below and reasserts on appeal, the information properly put defendant on notice that he could be convicted based on the April altercation or his yard signs, it is unclear why the State would feel the need to file a motion requesting that it be allowed to present the corresponding evidence.

conduct" that amounted to stalking. By the time of the jury instruction conference, the State insisted, for the first time, that each of the three acts constituted three independent commissions of a violation of a stalking no contact order, thus giving rise to the three separate propositions put before the jury. Where a defendant is apprised of a panoply of charges against him for the first time *after* the close of evidence at his trial, it cannot be said that he received a level of notice comporting with due process requirements.

¶ 50        In summary, the information in this case did not properly apprise defendant of charges stemming from his April altercation with Robert or his yard signs, and defendant's ability to defend against such charges was significantly hindered. Accordingly, the trial court erred by allowing the State to pursue that conduct as independent bases of defendant's guilt.

¶ 51                              B. Other Crimes Evidence

¶ 52        Ordinarily, a determination that a defendant was convicted on a charge for which he was not provided adequate notice is grounds for vacating that conviction. This case, however, is novel in that while the jury found defendant guilty under two uncharged propositions of guilt, it also found him guilty under a third proposition of which defendant *was* on notice. In other words, even when the findings of guilt pursuant to Propositions A and C are discounted, the finding of guilt under Proposition B, and the resulting conviction, remains intact.

¶ 53        Thus, the analysis must proceed to an additional step. As the evidence relating to the April altercation and defendant's yard signs was not evidence of any offense for which defendant was properly charged, it was evidence of *other* crimes. Evidence of other crimes or bad acts is inadmissible to demonstrate a defendant's propensity to commit the charged crime. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). As our supreme court has explained: "Courts generally prohibit the admission of [other crimes] evidence to protect against the jury convicting a

14

defendant because he or she is a bad person deserving punishment. [Citation.] Defendant is entitled to have his guilt or innocence evaluated solely on the basis of the charged crime." *Id.* Other crimes evidence may be admissible for purposes other than propensity, such as to prove intent, *modus operandi*, identity, motive, or absence of mistake. *Id.*

¶ 54    In the instant case, the other crimes evidence in question served no permissible purpose. With respect to Proposition B, there was no question as to intent, *modus operandi*, identity, motive, or mistake. The evidence was inadmissible.[4] See *id.*

¶ 55    The State does not argue that the introduction of other crimes evidence in this case is not grounds for vacatur of defendant's conviction. "Given that the State bears the burden of showing harmless error and has failed to make any such argument in its brief, it has forfeited any harmless-error analysis." *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 29. Still, it should be pointed out that evidence that defendant threatened to kill or maim Robert, possibly with an axe in hand, was *highly* prejudicial. The operative issue relating to Proposition B was whether defendant or Robby instigated the verbal altercation, with Robby's testimony pitted against that of defendant and Dunkin (*supra* ¶¶ 21-22). Given the task of determining who was the original aggressor, a serious possibility exists that the jury would resolve that question *against* the man who threatened to murder another person with an axe. Such a risk is precisely why other crimes evidence is generally inadmissible. Accordingly, we conclude that defendant is entitled to relief from his conviction.

---

[4]Moreover, Illinois Rule of Evidence 404(c) (eff. Jan. 1, 2011), requires that where the State intends to introduce evidence of other crimes of bad acts, "it must disclose the evidence, including statements of witnesses or a summary of the substance of any testimony, at a reasonable time in advance of trial." The State, having made its disclosure after the trial began, clearly did not comply with this requirement.

15

¶ 56    As to the form of that relief, defendant requests that we reverse his conviction outright, rather than remanding for a new trial. He asserts that he has completed the term of conditional discharged imposed by the court and points out that he has endured two trials—each of which, now, has resulted in an overturned conviction—stemming from an eight-year-old-charge for a nonviolent misdemeanor. The State takes no position on defendant's request.

¶ 57    In *People v. Campbell*, 224 Ill. 2d 80, 87 (2006), our supreme court reversed the defendant's misdemeanor conviction outright, rather than remanding, where defendant had already discharged his sentence for a misdemeanor offense and "a new trial *** would be neither equitable nor productive." While this court has recently observed that *Campbell* does not *mandate* outright reversal in these situations, the State in that case objected to the defendant's suggested approach. *People v. Manley*, 2021 IL App (3d) 180665-U, ¶ 21. There being no objection here from the State, we reverse defendant's conviction outright.

¶ 58                                III. CONCLUSION

¶ 59    The judgment of the circuit court of Kankakee County is reversed.

¶ 60    Reversed.

**No. 3-19-0499**

| | |
|---|---|
| **Cite as:** | *People v. Panozzo*, 2022 IL App (3d) 190499 |
| **Decision Under Review:** | Appeal from the Circuit Court of Kankakee County, No. 14-CM-1356; the Hon. Clark Erickson, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Elena B. Penick, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | James Rowe, State's Attorney, of Kankakee (Patrick Delfino, Thomas D. Arado, and Kelly A. Krapf, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

17